**William BRACY, Petitioner–Appellant,**

v.

**Richard B. GRAMLEY, Respondent–Appellee.**

**Roger COLLINS, Petitioner–Appellant,**

v.

**George C. WELBORN, Respondent–Appellee.**

Nos. 94–3801, 94–3807.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 29, 1995.

Decided April 12, 1996.

Rehearing and Suggestion for Rehearing En Banc Denied June 26, 1996.*

* Judges Ripple, Rovner, and Diane P. Wood voted to grant the petition for rehearing en banc.

Martin Carlson, Chicago, IL, Gilbert H. Levy (argued), Seattle, WA, for Bracy.

Rita M. Novak, Office of the Atty. Gen., Kevin Sweeney (argued), Office of the State's Atty. of Cook County, Criminal Appeals Div., Chicago, IL, for Gramley.

Stephen E. Eberhardt (argued), Marshall J. Hartman, Chicago, IL, Robert H. Farley, Jr., Naperville, IL, for Collins.

James E. Ryan, Office of the Atty. Gen., Steven J. Zick, Office of the Atty. Gen., Criminal Appeals Div., Chicago, IL, Kevin Sweeney (argued), Office of the State's Atty.

of Cook County, Criminal Appeals Div., Chicago, IL, for Welborn.

Before POSNER, Chief Judge, and CUMMINGS and ROVNER, Circuit Judges.

POSNER, Chief Judge.

William Bracy and Roger Collins were convicted in an Illinois state court in 1981 of three murders committed the previous year. They were sentenced to death and after exhausting their state remedies (see *People v. Collins*, 106 Ill.2d 237, 87 Ill.Dec. 910, 478 N.E.2d 267 (1985); 153 Ill.2d 130, 180 Ill.Dec. 60, 606 N.E.2d 1137 (1992)) sought habeas corpus in federal district court. Judge Hart denied them relief, *United States ex rel. Collins v. Welborn*, 868 F.Supp. 950 (N.D.Ill. 1994), and they have appealed, arguing that the state denied them due process of law both at their trial and in the sentencing hearing.

The victims had been taken, bound, from an apartment in a building on the south side of Chicago and had been driven to a viaduct and there shot to death with pistols and a shotgun. The main prosecution witness was Morris Nellum, an accomplice who testified for the government in exchange for being charged only with concealing a felony and promised that the state would recommend a sentence of only three years. (In fact he received only two and a half years—and of probation, not prison.) Nellum testified that Collins had summoned him to the apartment, where he had watched as the victims were led out of the apartment and into a waiting automobile by Bracy, Collins, and a third man, Hooper. (Hooper was tried separately, convicted, and sentenced to death. See *People v. Hooper*, 133 Ill.2d 469, 142 Ill.Dec. 93, 552 N.E.2d 684 (1989), affirming the conviction but vacating the death sentence. On remand, Hooper was again sentenced to death, and this time the Supreme Court of Illinois affirmed. 1996 WL 30547 (Ill. Jan. 25, 1996).)

Collins told Nellum to drive Collins's car, which was parked near the apartment building, to the viaduct. Collins and Hooper then got into the car that contained the three victims and drove away, followed by Bracy in another car. Nellum waited a few minutes and then drove to the viaduct as well. As he approached it, he heard shots. He stopped the car. Collins jumped in and they sped off. Later the two drove to Lake Michigan and Collins threw two pistols into the lake. Nellum, after he was arrested, told the police where the guns had been dumped, and the police found them there. Bullets found in the bodies of the dead men were of the type fired by these guns, although the guns had so deteriorated as a result of their prolonged immersion in the lake that no positive ballistics identification was possible.

Nellum's testimony was corroborated not only by the finding of the guns but also by testimony from a resident of the apartment building who saw the group leaving on the fatal night. She identified Collins, Nellum, and Hooper in court as resembling three of the men she had seen. She testified that one of the three had been wearing a wide-brimmed hat—and Nellum testified that Collins had indeed been wearing such a hat that night. Further corroboration of Nellum's testimony came from another resident, who testified to having seen Bracy and Collins in the building that night, and from a witness who testified that Bracy had borrowed a pistol from her before the murders and that afterward, when they were in a bar and she asked for the pistol back, he had told her that he had murdered some people with it. One of the pistols found in the lake on the basis of Nellum's tip turned out to be the pistol that she had lent Bracy. This witness also testified that in the same bar she had seen a woman give Bracy a sawed-off shotgun that Bracy had then handed to an employee of the bar, apparently for safekeeping. Bracy and Collins testified on their own behalf, denying any participation in the murders, and presented a parade of alibi witnesses of dubious credibility.

The evidence of guilt presented at the trial was compelling, and while there is a question, as we shall see, about the veracity of some of Nellum's testimony, even if that question were resolved in the defendants' favor we would have no basis for doubting the guilt of either Bracy or Collins. Hooper was tried separately because his confession

implicated them and the confession is further evidence, though of course not evidence presented to the jury in our case, that they really did, along with Hooper, commit the murders. Because this evidence was inadmissible it cannot be used to show that the errors of which Bracy and Collins complain are unlikely to have affected the verdict. Cf. *Sullivan v. Louisiana*, 508 U.S. 275, 278–79, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993); *United States v. Ross*, 77 F.3d 1525 (7th Cir. 1996). But the evidence that *was* admissible shows that they were guilty and this is important because, with a few exceptions, a person convicted in a state court may not obtain an order for a new trial from a federal court on the basis of constitutional errors committed at the trial unless the errors resulted in actual prejudice, or, equivalently, unless they substantially influenced the verdict, *Brecht v. Abrahamson*, 507 U.S. 619, 637–38, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993), or, in other words, were likely to have made the difference between conviction and acquittal.

The only error that the petitioners argue requires a new trial regardless of whether it was prejudicial is that the judge who presided at their trial was later convicted of having accepted bribes from criminal defendants in several other cases (including murder cases) around the time when Bracy and Collins were tried. *United States v. Maloney*, 71 F.3d 645, 650–52 (7th Cir.1995). There is no suggestion that Bracy and Collins bribed or offered to bribe him. The argument rather is that Judge Maloney came down hard on criminal defendants in cases in which he was *not* bribed, to avoid suspicion that he was on the take, to cancel any bad impression that his acquittals might make on the voters— maybe even to make defendants desperate to bribe him, fearing he would punish them with adverse rulings if they did not. There is no evidence, but only conjecture, that Maloney actually did lean over backwards in favor of the prosecution in this or any other case in which he was not bribed; did, that is, rule against the defense only because he was taking bribes in other cases. Collins argues that evidence is unnecessary, and Bracy that if it is necessary their request for discovery should have been granted.

A judge could be biased and yet the bias not affect the outcome of the case. But judicial bias is one of those "structural defects in the constitution of the trial mechanism," as distinct from mere "trial errors," that automatically entitle a petitioner for habeas corpus to a new trial. *Brecht v. Abrahamson, supra*, 507 U.S. at 629, 113 S.Ct. at 1717; see *Sullivan v. Louisiana, supra*, 508 U.S. at 278–79, 113 S.Ct. at 2081; *Tumey v. Ohio*, 273 U.S. 510, 535, 47 S.Ct. 437, 445, 71 L.Ed. 749 (1927); *Tyson v. Trigg*, 50 F.3d 436, 442 (7th Cir.1995). What is bias? Defined broadly enough, it is a synonym for predisposition, and no one supposes that judges are blank slates. There are prosecution-minded judges, and defense-minded judges, and both sorts have predispositions— biases that place an added burden on one side or the other of the cases that come before them. Yet no one supposes that the existence of such biases justifies reversal in cases where no harmful errors are committed. The category of judicial bias is ordinarily limited to those predispositions, real or strongly presumed, that arise from some connection pecuniary or otherwise between the judge and one or more of the participants in the litigation. Whether the present case even fits that mold may be doubted, but, in any event, for bias to be an automatic ground for the reversal of a criminal conviction the defendant must show either the actuality, rather than just the appearance, of judicial bias, "or a possible temptation so severe that we might presume an actual, substantial incentive to be biased." *Del Vecchio v. Illinois Dept. of Corrections*, 31 F.3d 1363, 1380 (7th Cir.1994) (en banc); see *Branion v. Gramly*, 855 F.2d 1256, 1268 (7th Cir.1988); *Margoles v. Johns*, 660 F.2d 291, 296–97 (7th Cir.1981) (per curiam). In rejecting reversal on the basis of a mere appearance of partiality or bias *Del Vecchio* relied in part on a presumption, obviously inapplicable here, that judicial officers perform their duties faithfully. 31 F.3d at 1372–73. But that was not the core of the decision. The fundamental reason that an appearance of impropriety is not alone enough to require a new trial is that it provides only a weak basis for supposing the original trial an unreliable test of the issues

presented for decision in it. The fact that Maloney had an incentive to favor the prosecution in cases in which he was not bribed does not mean that he did favor the prosecution in such cases more than he would have done anyway.

Sometimes—this is the second half of the test that we quoted from *Del Vecchio*—the incentive to engage in biased behavior is so great that inquiry into the actuality of that behavior is pretermitted. *Id.* at 1372–73; see also *In re Murchison*, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955). This rule recognizes both the practical impediments to obtaining reliable evidence of a judge's motives and the difficulty of overcoming public skepticism of judicial motives when the temptation to impropriety is great. But the automatic rule must be interpreted circumspectly, with due recognition of the cost to society of overturning the convictions of the guilty in order to vindicate an abstract interest in procedural fairness. The fact that the people for obvious practical reasons do not have judicially enforceable rights to the protection of the criminal laws (though they do have judicially enforceable rights against discriminatory withdrawal of that protection) does not warrant a court in disregarding their interests when the court is formulating rules of constitutional law. Accepting Collins's contention would require a new trial in *every* case, jury and nonjury, capital and noncapital, in which a judge later found to be corrupt had presided and the defendant had been convicted, even though the judge had not been bribed by the prosecutor. (If the *defendant* had bribed the judge and been acquitted, the double jeopardy clause probably would not bar reprosecution, *Benard v. State*, 481 S.W.2d 427, 430 (Tex.Crim.App.1972)—the defendant would never have been in any actual "jeopardy." The issue has not been definitively resolved, however, David S. Rudstein, "Double Jeopardy and the Fraudulently-Obtained Acquittal," 60 *Mo. L. Rev.* 607 (1995), and obviously need not be in order to decide the present case.) *Any* judge who is on the take will have an incentive to adopt Judge Maloney's alleged strategy and thus always do his best (or worst) to see to it that a defendant who does not bribe him is convicted. A principled acceptance of Collins's argument would thus require the invalidating of tens of thousands of civil and criminal judgments, since Judge Maloney alone presided over some 6,000 cases during the course of his judicial career and he is only one of eighteen Illinois judges who have been convicted of accepting bribes. The fact that this is a death case magnifies the appearance of impropriety but is irrelevant to an issue that goes to the propriety of conviction rather than merely to that of the sentence.

The assumption underlying Collins's argument is that a judge's corruption is likely to permeate his judicial conduct rather than be encapsulated in the particular cases in which he takes bribes. The assumption is plausible but the consequences are unacceptable. If we were to inquire into the motives that lead some judges to favor the prosecution, we might be led, and quickly too, to the radical but not absurd conclusion that *any* system of elected judges is inherently unfair because it contaminates judicial motives with base political calculations that frequently include a desire to be seen as "tough" on crime. See generally Steven P. Croley, "The Majoritarian Difficulty: Elective Judiciaries and the Rule of Law," 62 *U.Chi.L.Rev.* 689, 726–29 (1995).

No precedent has been cited to us for invalidating a judge's rulings in a case in which he is known not to have taken a bribe, simply because he took bribes in other cases. *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), disapproved the use of novel grounds to grant relief on an application for habeas corpus. The state does not cite *Teague*, but we are free to apply it anyway. *Caspari v. Bohlen*, —— U.S. ——, ——, 114 S.Ct. 948, 953, 127 L.Ed.2d 236 (1994); *Eaglin v. Welborn*, 57 F.3d 496, 499 (7th Cir.1995) (en banc). The argument for automatic reversal is not compelling even if its lack of a secure grounding in prior cases and its alarming potential irradiation of future cases are ignored. While a corrupt judge might decide to tilt sharply to the prosecution in cases in which he was not taking bribes—to right the balance as it were—it is equally possible that he would fear that by doing so he would create a

pattern of inconsistent rulings that would lead people to suspect he was on the take. When a severely prosecutorial judge sides unexpectedly with the defense in some arbitrary subset of cases, corruption is a possible explanation. If instead the judge maintains a generally pro-defendant stance, he may jeopardize his chances for reelection (Maloney was appointed to a vacancy, but he had to stand for election, and did so, when the term of his original appointment expired), and the number and size of the bribes he receives may be diminished because defendants will be less fearful of the consequences of not bribing him. But he may also still any suspicions that he is on the take, because his rulings in favor of defendants in cases in which he is bribed will not stand out.

This was a jury trial rather than a bench trial, moreover, and acquittals in jury trials are more likely to be blamed on the jury than on the judge. When as sometimes happens a judge campaigning for election is accused of never having convicted a rapist or sentenced a murderer to death, cf. *Buckley v. Illinois Judicial Inquiry Board,* 997 F.2d 224, 226 (7th Cir.1993), the reference is to bench trials, where the decision to convict or acquit is the judge's, and to sentences handed down by judges rather than, as in capital cases in Illinois, by juries unless the defendant waives a jury. It is in cases tried to the bench that the judge as decision-maker must shoulder full responsibility for the decision. When he merely presides, his responsibility for the outcome is less. We do not understand Bracy and Collins to be arguing that Maloney was more likely to sentence them to death, as distinct from being more likely to rule against them during the trial, as a consequence of his taking bribes in other cases.

We are, it is true, speculating about the likely impact of Maloney's corruption on the rulings that he made at the trial of these petitioners. We also acknowledge the possibility that the cumulative effect of those rulings was greater than we imagine. *Tyson v. Trigg, supra,* 50 F.3d at 439. But the defendants are speculating too. Some of Maloney's rulings went against the defendants and obviously those are the ones they complain about, but they have not shown that

there were so few rulings in their favor that the judge *must* have been biased in favor of the government. To show this would not have required an investigation, but merely a review of the transcript of the trial. It is unlikely that the specific rulings of which the defendants complain either were the product of a corrupt backward bending in the government's favor or influenced the jury's verdict. The Supreme Court of Illinois did not find any errors in the rulings.

 The argument that a judge who accepts bribes in some cases is corrupt in all is not a sufficiently compelling empirical proposition to persuade us to treat this case as if Judge Maloney had taken a bribe from the government to convict. If the argument is rejected, ours is a case in which there is merely an appearance of impropriety in the judge's presiding, and an appearance of impropriety does not constitute a denial of due process. Appearance of impropriety there was. We know this because if a judge were under indictment for accepting bribes he would not be permitted to hear any cases. Ill. S.Ct. R. 56(a)(1). But without more a defendant's conviction cannot be set aside.

 The petitioners also seek discovery, so that they can try to find out whether there was actual bias by Judge Maloney at their trial. Discovery is available in a habeas corpus proceeding not as a matter of course as in an ordinary civil litigation but only if the district judge finds "good cause" to order discovery. Rule 6(a) of the Rules Governing Section 2254 Cases in the United States District Courts; *East v. Scott,* 55 F.3d 996, 1001 (5th Cir.1995). The petitioners want to study a large sample of Judge Maloney's cases to see whether a pattern of favoring the prosecution in cases in which he was not bribed emerges, to depose "some of those persons and witnesses who were most intimately associated with Judge Maloney who may be able to provide material information on his behavior in cases where he didn't get bribes," and to get hold of any evidence that the federal government might have obtained in its prosecution of Maloney that he really did lean over backwards in favor of the government in cases in which he was not bribed— perhaps in this very case. The first proposal

would not require formal discovery at all, since Maloney's cases are a matter of public record. The third too; in the first instance at any rate, all it would require is a perusal of the transcript of Maloney's trial. It is true that a part of the trial record was sealed, but it was unsealed in August of 1994, so that the petitioners' lawyers have had a year and a half to look for clues in that record. The second proposal is for a fishing expedition. Even if the expedition discovered that Maloney did lean over backwards in favor of the prosecution in cases in which he was not bribed, in order to conceal his taking of bribes in other cases, it would not show that he followed the practice in this case. This may be a case in which *any* judge would have ruled in favor of the government in the instances of which the defendants complain.

A party to an ordinary civil suit need not demonstrate good cause in order to be permitted to conduct discovery. A petitioner for habeas corpus must, because collateral attack on a criminal judgment that has become final is an extraordinary remedy. Without the aid of formal discovery the petitioners' able counsel could have (and perhaps have) studied the pattern of Judge Maloney's rulings in cases in which he did and cases in which he did not take bribes, could have (and perhaps have) inventoried his rulings in the present case to see whether they consistently favored the prosecution, and could have (and perhaps have) studied the record of Maloney's prosecution by the United States for clues to their theory of bias. If none of these public sources of information has yielded any evidence of bias in our case—and none has—the probability is slight that a program of depositions aimed at crooks and their accomplices and likely to be derailed in any event by real and feigned lapses of memory will yield such evidence.

We do not make light of judicial corruption. It has tainted the judicial system of Illinois, caused unjust acquittals, jeopardized convictions, tarnished the legal profession, and raised profound doubts not only about the state's method of selecting judges but also about the entire political culture of the state. But in the circumstances of this case, corruption is not a constitutional ground for vacating the petitioners' convictions.

The petitioners raise another issue of bias, this in the context of a claim of ineffective assistance of counsel. One of the jurors was the wife of an Illinois state judge who had once sentenced Bracy to prison for armed robbery. The defendants' lawyer was aware of this but did not object to her being selected for the jury. Toward the end of the trial, however, the lawyer revealed to the jury that Judge Downing, the juror's husband (though not identified as such to the jury), had once given Bracy the most severe sentence that he had ever received prior to this case. The petitioners argue that, thus reminded that her husband had dealt harshly with Bracy on a prior occasion, Mrs. Downing was bound to be prejudiced against Bracy and perhaps therefore his codefendant as well. This is too thin a speculation to justify a new trial on the ground of ineffective assistance of counsel and we are not persuaded by the proposal that in lieu of ordering a new trial we order the district court to conduct an evidentiary hearing at which Mrs. Downing would be questioned about what she was thinking when she was a member of the jury fourteen years ago. The defendants were content to have as a juror the wife of the judge *who they knew had sentenced Bracy to a long prison term*, and the decision to accept her is not and could not plausibly be claimed to be ineffective assistance. Only the lawyer's slip of the tongue that revealed this fact to her could be thought ineffective assistance. But if so, the likely prejudice was too slight to warrant a new trial, or an evidentiary hearing unlikely to be any more fruitful than discovery concerning Judge Maloney.

Another alleged irregularity at trial is the judge's failure to strike remarks made by the prosecutors in closing argument. The worst remark to which an objection has been preserved was: "and if you think I would jeopardize my license, my family, my children, my future to put [a peripheral witness named Dorfman] on in a case and make him lie. . . ." This is claimed to be "vouching" for the truth of the witness's testimony, which prosecutors are not supposed to do, because

it crosses the line from advocacy to testimony. Defense counsel had accused the prosecutor of wanting to convict Collins so badly that he "made a guy [Dorfman] come in here and tell you something that he knows is not in that report." In other words, defense counsel was accusing the prosecutor of having made a witness tell a lie. The prosecutor denied this in the passage that we have quoted. This was not vouching for the truth of the witness's testimony. It was denying that the prosecutor had made the witness lie. And anyway vouching is not a violation of any specific constitutional right but at most an irregularity that if shown in a particular case to have been likely to have led to the conviction of an innocent man might be held to be a denial of due process of law in that case. *Rodriguez v. Peters*, 63 F.3d 546, 558 (7th Cir.1995); *Kappos v. Hanks*, 54 F.3d 365, 367 (7th Cir.1995). No such inference is possible here.

The next question is the standard for granting an evidentiary hearing when, long after the conviction of a criminal defendant, a prosecution witness steps forward and recants a part of his testimony. Many years after the trial of Bracy and Collins, a private investigator retained by the defendants' counsel talked to Morris Nellum. Later Nellum was interviewed by Bracy's lawyer and a transcript was made of that interview. Nellum did not recant his testimony that Bracy and Collins had committed the murders. He merely tried to exonerate the third murderer, Hooper. But in explaining how he had come to testify against Hooper he made lurid accusations that the police had beaten Bracy and him (Nellum) and threatened him with a sledgehammer and that the prosecutors had told him to lie about such details as when he had first told the police where the pistols used in the murders had been pitched. The jury had been told that Nellum had at first denied knowing the whereabouts of the gun but not that the prosecutors had told him to lie about that denial.

Nellum later repeated a part of his recantation in a deposition that was interrupted when an Illinois prosecutor who had talked to him after the interview with defense counsel, and an Arizona prosecutor, reminded Nellum that he had said he only wanted to testify in front of a judge. In seeking an evidentiary hearing the defendants' lawyers rely primarily on the transcript of the interview rather than on the interrupted deposition. They argue that it creates enough suspicion that the prosecutors knowingly used perjured testimony at the trial to require an evidentiary hearing to get to the bottom of Nellum's recantation.

None of the alleged lies concerns a matter vital to the government's case. Nellum did not deny that he was present when the victims were removed from the apartment, that he drove to the viaduct to pick up Collins, and that he saw Collins toss the pistols into Lake Michigan. Yet if the jury had thought that the police had beaten Nellum and that the prosecutors had coerced him to lie, albeit about details of the offense rather than about the involvement of the defendants, his credibility, already compromised because he was testifying in exchange for the promise of a sentence extraordinarily lenient considering that he had been an accomplice in three murders, might have been so far impaired that the jury would have disbelieved the core as well as the periphery of his testimony.

 Given this possibility, we must consider what showing based on newly discovered evidence that a constitutional violation may have been committed at trial (here, the knowing use of perjured evidence by the prosecution) is necessary before a hearing to determine the truthfulness of the evidence is required. The state argues only weakly that the petitioners should have obtained the recantation sooner, in which event it would not be newly discovered evidence in the relevant sense. *Dever v. Kansas State Penitentiary*, 36 F.3d 1531, 1536 (10th Cir.1994). So the request for an evidentiary hearing is not barred by a want of diligence, and furthermore it cannot be a condition of the grant of such a hearing that the movant already have in his possession all the evidence that he seeks to develop in the hearing. But equally it cannot be enough that the petitioner has found *some* new evidence. To reopen a criminal proceeding many years after the defendant was convicted and his conviction affirmed (which in this case occurred more

than ten years ago) is an extraordinary interference with the finality of the criminal process and requires a demonstration that a hearing would probably yield evidence that would require a new trial at which the petitioner would have a substantial chance of acquittal. In view of the passage of time since, and the disordered social milieu in which, the petitioners committed these murders, it is doubtful whether they could be retried with good prospects for an accurate verdict, even though their guilt of multiple murders committed in cold blood is not in doubt. They cannot be blamed for the fact that it has taken fifteen years for their challenge to their convictions to come to this court; so far as we can tell, they have not abused the postconviction process. But one consequence of the extraordinary delays that are tolerated in capital cases in order to minimize the risk of mistaken execution is ' that an order for a new trial issued toward the end of the normal postconviction process may have the practical effect of an acquittal. This consideration makes judges hesitate to order new trials on the basis of newly discovered evidence unlikely to be reliable or, even if believed, to undermine confidence in the verdict.

█ We are mindful that in *Townsend v. Sain*, 372 U.S. 293, 312, 83 S.Ct. 745, 756, 9 L.Ed.2d 770 (1963), the Supreme Court stated that "where the facts are in dispute, the federal court in habeas corpus must hold an evidentiary hearing" unless the petitioner received a full and fair hearing in state court. This passage from the *Townsend* opinion continues to be quoted approvingly. See, e.g., *Herrera v. Collins*, 506 U.S. 390, 399, 113 S.Ct. 853, 860, 122 L.Ed.2d 203 (1993). But it cannot be taken literally, since we know that the district court "may employ a variety of measures in an effort to avoid the need for an evidentiary hearing" on disputed facts, *Blackledge v. Allison*, 431 U.S. 63, 81, 97 S.Ct. 1621, 1633, 52 L.Ed.2d 136 (1977), including a direction to expand the record to include evidentiary materials that may resolve the factual dispute without a hearing. *Id.* at 82, 97 S.Ct. at 1633; Rule 7 of the Rules Governing Section 2254 Cases in the United States District Courts.

█ Likewise, not any old allegation of newly discovered evidence will trigger an evidentiary hearing; the allegation must be "substantial." *Townsend v. Sain, supra*, 372 U.S. at 313, 83 S.Ct. at 757. That is common sense. Had Judge Hart in his order of August 24, 1994, granted rather than denied the motion for an evidentiary hearing, and the hearing been held later that year, the witnesses, primarily Nellum and the prosecutors and police involved in the investigation and prosecution of the murder cases against Bracy, Collins, and Hooper, would have been testifying about events that had occurred thirteen to fourteen years earlier. So long an interval between the events and the testimony about the events would cast a pall of doubt over the reliability of the testimony. Ours is not the typical situation in which an evidentiary hearing is granted in a postconviction proceeding. Not only is the interval typically shorter, as in *Daniels v. United States*, 54 F.3d 290 (7th Cir.1995), and *Barkauskas v. Lane*, 878 F.2d 1031, 1034 (7th Cir.1989), but when it is as long as it would be here this is usually because the state failed to give the petitioner a full and fair hearing, and the state must not be rewarded for its own denials of due process. When the request for a federal evidentiary hearing is based on evidence gathered long after the event—too late to be presented to the state courts, which cannot be faulted for having failed to provide the petitioner with an evidentiary hearing—the federal court is entitled to insist, as a precondition to granting a hearing, that the petitioner demonstrate that he have a "colorable" claim, meaning by this not that it be nonfrivolous on its face (the usual meaning of "colorable") but that there be some reason to think it valid. *Siripongs v. Calderon*, 35 F.3d 1308, 1314 (9th Cir. 1994).

█ Even if Nellum testified under oath to all that he had told Bracy's lawyer and even if his testimony were believed over that of prosecutors and police almost certain to testify contrary to Nellum, thus establishing that the prosecution made knowing use of perjured testimony, a new trial would not be warranted. The knowing use of perjured testimony by the prosecution, although a

very serious infringement of the constitutional rights of a criminal defendant, is not an automatic basis for a new trial. There must be a reasonable likelihood that the violation affected the verdict. *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976); *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *United States v. Boyd,* 55 F.3d 239, 243 (7th Cir.1995). The evidence of Bracy's and Collins's guilt was very powerful and evidence brought out at the evidentiary hearing which if repeated at a new trial would merely cast doubt on Nellum's credibility would be unlikely to sway a jury. We are imagining a new trial at which all the evidence is the same except that Nellum changes some of the details of his earlier testimony, and, when the changes are thrown in his face, makes lurid accusations against the police and the prosecutors. The core of Nellum's testimony would be unaffected and would be richly corroborated by the testimony of the other witnesses whose evidence we summarized at the beginning of this opinion (assuming those witnesses can be found and persuaded to testify or the transcript of their original testimony is admitted at the second trial), and by the guns. Of course we cannot be certain that once Nellum started down the recantation path he would go no further than he has done to date. Having completed his bargained for sentence long ago he has no incentive to cooperate with the prosecution. But the more sweeping his recantation, the less credible it is likely to be.

Prosecutors frequently rely heavily on the testimony of members of the criminal class, such as Nellum, who did not "go straight" after completion of his light sentence for his role in the murders. They have no choice. These witnesses from the criminal demimonde are not only unreliable witnesses, as the defendants' counsel emphasized to the jury in asking them to disbelieve Nellum's testimony; they are unreliable *people.* We would be imperiling the punishment of dangerous criminals if we established a precedent that would invite the lawyers for convicted defendants (especially in capital cases, not only because of the stakes involved but also because few prisoners other than those

under sentence of death are represented in postconviction proceedings) to pester these witnesses to recant many years after they had testified. We do not suggest that the lawyers would act unethically. In the American system of justice the zealous representation of a client is a duty, not an ethical lapse. And in some cases the recantations would be genuine and material and if so they would be a proper basis for ordering a new trial despite the passage of time. But we are given no reason to suppose that Nellum's recantations are either genuine or material. His original testimony was amply corroborated and his recantation preserved the core of the original testimony intact. And while the interview with Bracy's lawyer occurred in 1992 and the abortive deposition the following year, in the more than two years that have elapsed since the deposition the defendants' current lawyers, whose energy and ability cannot be doubted, have failed to obtain any corroboration for Nellum's recantation.

We cannot of course determine the credibility of Nellum's recantation; we can only express our suspicions. These are germane, however, because an evidentiary hearing need not be granted on the basis of newly discovered evidence presented many years after the defendant's conviction became final unless there is a good reason to expect the hearing to result in an order for a new trial. We cannot find this proposition clearly articulated in any case, but it seems to us consistent with the results in the cases and sound as a matter of first principles. The circumstances of Nellum's recantation, the strength of the original evidence, and the fact that the core of his testimony was not recanted persuade us that the request for an evidentiary hearing was properly denied.

■ We turn to the defendants' challenge to the sentencing hearing. They complain that their lawyers were not given enough time to obtain evidence of mitigating circumstances for submission to the jury at that hearing. They asked for a continuance immediately after the jury convicted their clients but it was denied. It was properly denied. In Illinois the jury that determines the defendant's guilt in a capital case also

determines whether he is to be sentenced to death, unless as in this case the defendant waives his right to be sentenced by the jury. Since it is the same jury, the sentencing hearing perforce follows immediately upon the trial, as it also does when the jury is waived. Defense lawyers know all this and therefore if they wish to gather evidence of mitigating circumstances they must do so before the trial ends, because they will have no time to do so after the trial ends. But in this case the defendants' lawyers dropped the ball and the defendants argue in the alternative that by doing so the lawyers failed to provide competent assistance of counsel at the sentencing hearing.

 Perhaps so, but we need not decide this; for there was no prejudice, and without proof of prejudice a claim of ineffective assistance of counsel cannot succeed. The defendants' current lawyers have turned up no mitigating circumstances that might have been put before the jury with a fair chance of success. It is true that one of the *aggravating* circumstances, though limited to Bracy, is that shortly after participating in the triple murder in Chicago he participated in a double murder in Arizona. He had not yet been tried for those murders but the woman who was the wife and daughter of the murder victims and the state's main witness was brought to Chicago to testify in the sentencing hearing that Bracy was indeed one of the Arizona murderers. The defendants argue that their lawyers failed to present alibi evidence that might have persuaded the jury that Bracy had not committed those murders. We have little patience with this argument. Bracy was later convicted and sentenced to death for the Arizona murders, and the burden of proof that the state bore in convicting him was of course higher than it bore in the sentencing hearing, for the existence of an aggravating circumstance need only be proved by a preponderance of the evidence, provided that at least one such circumstance has been proved beyond a reasonable doubt, thus making the defendant eligible for the death sentence. 720 ILCS 5–9–1 (f); *Free v. Peters,* 12 F.3d 700, 703 (7th Cir.1993); *People v. Ramey,* 152 Ill.2d 41, 178 Ill.Dec. 19, 35–36, 604 N.E.2d 275, 291–92 (1992). So if all the evidence that had been

before the Arizona jury had been presented to the jury in Chicago, the Chicago jury surely would have found that Bracy had committed the Arizona murders. Not all that evidence was presented, so maybe the jury would have been swayed by alibi evidence that we now know is false. But no principle of justice authorizes throwing out a sentence on the ground that the sentence might have been different had the defendant been allowed to present false testimony. *Lockhart v. Fretwell,* 506 U.S. 364, 369–71, 113 S.Ct. 838, 842–43, 122 L.Ed.2d 180 (1993); *Nix v. Whiteside,* 475 U.S. 157, 175–76, 106 S.Ct. 988, 998–99, 89 L.Ed.2d 123 (1986).

 Bracy objects to some remarks by the prosecutor at the closing argument at the sentencing hearing. The worst was, "Some of us went to Viet Nam and had to kill for this country, and I will be damned if anybody is going to tell me that what we did in Viet Nam or in any other war was a violation of the Fifth Commandment of the Bible." This was a response to defense counsel's argument that to sentence the defendants to death would violate the Ten Commandments, one of which of course is, "Thou shalt not kill." The prosecutor was pointing out, with unnecessary but not we think fatally prejudicial emphasis, that there is such a thing as justified homicide and that the execution of a duly convicted and sentenced murderer is, plausibly, an illustration of it.

Collins objects to the exclusion of a prospective juror on the basis of his acknowledging in response to a question by the judge that he would "probably" not consider imposing the death penalty. The defendants' lawyer did not object to excusing this prospective juror for cause. We do not think this was error, and certainly not error of constitutional proportions, given the absence of an objection. *Wainwright v. Witt,* 469 U.S. 412, 424–26, 429, 105 S.Ct. 844, 852–54, 855 83 L.Ed.2d 841 (1985).

The petitioners present other issues, but they either have too little merit to warrant discussion or they are foreclosed by previous decisions of this court that we are not given any reason to reexamine. We have considered the possibility that the cumulative effect

of the various irregularities alleged tips the balance in favor of a new trial or a new sentencing hearing but have concluded that it does not. We regret that Judge Maloney presided over the petitioners' trial but we do not think that the Constitution relieves them from the judgments that the Illinois courts have rendered.

AFFIRMED.

ILANA DIAMOND ROVNER, Circuit Judge, dissenting.

No right is more fundamental to the notion of a fair trial than the right to an impartial judge. *Johnson v. Mississippi,* 403 U.S. 212, 216, 91 S.Ct. 1778, 1780, 29 L.Ed.2d 423 (1971) (per curiam); *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955); *see also Aetna Life Ins. Co. v. Lavoie,* 475 U.S. 813, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986); *Ward v. Village of Monroeville, Ohio,* 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972); *Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927). "The truth pronounced by Justinian more than a thousand years ago, that '[i]mpartiality is the life of justice,' is just as valid today as it was then." *United States v. Brown,* 539 F.2d 467, 469 (5th Cir.1976) (per curiam). The constitutions of our nation and of our states, the rules of evidence and of procedure, and 200 years of case law promise a full panoply of rights to the accused. But ultimately the guarantee of these rights is no stronger than the integrity and fairness of the judge to whom the trial is entrusted.

The State of Illinois placed the fate of William Bracy and Roger Collins in the hands of a racketeer. Thomas Maloney is presently serving a prison term of nearly sixteen years for racketeering, conspiracy to commit racketeering, extortion under color of official right, and obstruction of justice. A jury determined that Maloney had accepted $10,000 in 1986 to acquit two El Rukn leaders of a double murder, an undetermined portion of a $100,000 payment in 1981 to acquit three New York gang members of murdering a rival in Chicago's Chinatown, and between $4,000 and $5,000 in 1982 to convict another individual of voluntary manslaughter rather than felony murder. These were but three of the bribes that witnesses attributed to Maloney at his trial. *See United States v. Maloney,* 71 F.3d 645 (7th Cir. 1995); Matt O'Connor, *Judge Maloney found guilty in corruption case,* CHICAGO TRIBUNE, April 17, 1993, News, at 1. At sentencing, Judge Leinenweber also found that Maloney had, while still a practicing lawyer, cooperated in procuring the notorious acquittal of reputed mob hitman Harry Aleman by Judge Frank Wilson in 1977. Mob enforcer Michael Bertucci testified that Maloney had helped him to evade a series of criminal charges by bribing judges as far back as the late 1960s, although Judge Leinenweber discounted this testimony. It would seem, in any event, that by the time Maloney ascended to the bench in 1977, he was well groomed in the art of judicial corruption, an art that he would practice at least until 1986, when he correctly perceived that he was under the watchful eye of the FBI and returned the $10,000 bribe he had accepted in the El Rukn prosecution.

Bracy and Collins were tried before Maloney in 1981, in the midst of Maloney's bribe taking. Maloney did not solicit a bribe from either defendant, nor did the defendants offer him one. Nor did the prosecution bribe Maloney. But given the abundant proof (and a federal jury's finding) that justice was for sale in Maloney's courtroom, we are compelled to consider whether Maloney may be deemed the impartial judge to which due process entitled these defendants.

### 1.

The petitioners argue that in cases that were not fixed, Maloney had an incentive to be particularly tough on defendants, in order to divert suspicion that might otherwise be aroused by the acquittals he was paid to render and to strengthen the incentive for defendants to bribe him. Without conceding that further evidence of Maloney's partiality was required to establish Maloney's constitutional inadequacy as a judge, the petitioners sought leave from the district court to engage in discovery, with the aim of establishing a pattern of corruption that affected Maloney's conduct in not only those cases in which he had accepted a bribe but also those

in which he had not. Judge Hart denied their request, deeming what the petitioners sought to prove to be a matter of speculation and, in any event, insufficient to establish a constitutional deprivation. *United States ex rel. Collins v. Welborn*, 868 F.Supp. 950, 991 (N.D.Ill.1994). Like my colleagues in the majority, the district judge concluded that the most the circumstances permitted Bracy and Collins to argue was the mere possibility of bias, which *Del Vecchio v. Illinois Dep't of Corrections*, 31 F.3d 1363 (7th Cir.1994) (en banc), *cert. denied*, —— U.S. ——, 115 S.Ct. 1404, 131 L.Ed.2d 290 (1995), indicates is not enough to establish a deprivation of due process. 868 F.Supp. at 991.

In fact, the notion that Maloney was deliberately tough on defendants who did not bribe him finds support in the testimony presented at Maloney's trial. Defense attorney William Swano arranged several of the bribes for which Maloney was prosecuted and was a key government witness against him. In 1985, Swano represented James Davis, whom the state had charged with armed robbery. The case was assigned to Maloney for trial. By this time, Swano had already bribed Maloney on a number of occasions. But after investigating the prosecution's case against Davis, Swano concluded that it would be unnecessary to bribe Maloney in order to obtain an acquittal in this case: three witnesses to the robbery knew the two perpetrators and said that Davis was not one of them; Davis had an alibi; and the victim of the crime, who had initially identified Davis as one of the perpetrators, had confessed uncertainty about the identification. Swano was confident that "[t]he case was a not guilty in any courtroom in the building." *United States v. Thomas J. Maloney and Robert McGee*, No. 91 CR 477, 1994 WL 96673 Tr. 2528 (N.D.Ill. March 24, 1993). To Swano's surprise, however, Maloney convicted his client after a bench trial. Swano took this as a lesson that "to practice in front of Judge Maloney ... we had to pay." Tr. 2530. That Swano had correctly interpreted this conviction as a lesson was arguably confirmed by Maloney's bagman, Robert McGee. Swano met with McGee soon after Davis was convicted to discuss a fix in the double murder trial of the two El Rukns. Swano had persuaded his client that bribing Maloney was the prudent course, explaining that he had only lost one case before Maloney, "and that was the one that we didn't work," *i.e.*, fix. Tr. 2544; *see also* Tr. 2559. In arranging the meeting with McGee, Swano had told him that he wanted to discuss "a hot case in front of Judge Maloney". Tr. 2566. McGee said that he would first have to obtain Maloney's permission. Tr. 2567. When Swano and McGee subsequently met at Le Bourdeux, a local watering hole, McGee told Swano that he had gotten the okay from Maloney to speak about the matter. Swano recalled: "He told me that the judge had said we could talk, especially in view of the way the judge had screwed me on the last case," which Swano understood to be a reference to the Davis case. Tr. 2567–68. Swano voiced agreement with the assessment "that the judge had screwed me on the case and had screwed my client." Tr. 2568. He and McGee then got down to details about the El Rukn fix. That bribe was one of four that the jury later found Maloney guilty of accepting.

One may infer from Swano's testimony that Maloney saw the Davis prosecution, in which no bribe was tendered, as an opportunity to teach Swano a lesson that would ensure bribes in future cases. That, at least, was the moral of the story for Swano. If Swano was right (a matter for the factfinder, not us, to determine), then it would seem that Maloney's approach to case fixing was indeed the global view that Bracy and Collins posit: fixed cases were a source of illicit profit, whereas unfixed cases were an opportunity, as Bracy puts it, to "advertise" in the defense bar (Bracy Reply at 1) while at the same time protecting his franchise by currying favor with law and order minded voters and avoiding the ire of the law enforcement community. Like my colleagues, I think that the petitioners face an exceedingly difficult task in attempting to unearth evidence that will lend further support to their theory (*see ante* at 691), but Swano's testimony suggests that the search may not be futile.

At bottom, my colleagues believe that Bracy and Collins are not entitled to discovery because the most they can hope to prove is

that Maloney made it a practice to lean over backwards in favor of the prosecution in cases in which he was not bribed; without proof that he followed that practice in *this* case, they reason, Bracy and Collins have no claim. *Ante* at 691. But when the trial judge is tainted by a pervasive conflict of interest—in other words, one not limited to a particular litigant or type of case-evidence that the taint had a discernible effect on a given case is unnecessary. Here the showing that my colleagues require would be all but impossible to make, absent either an extraordinary admission from Maloney, which is not forthcoming (Maloney continues to proclaim his innocence) or the kind of over-the-top courtroom behavior that makes a judge's partiality plain (*see, e.g., United States v. Dellinger,* 472 F.2d 340, 386–88 (7th Cir.1972), *cert. denied,* 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1973)), a rare phenomenon not evident from the record here. In any event, the Supreme Court has expressly rejected the idea that such proof is mandated, finding that it "requires too much and protects too little." *Ward,* 409 U.S. at 61, 93 S.Ct. at 83; *see also Aetna,* 475 U.S. at 830–31, 106 S.Ct. at 1590 (Brennan, J., concurring); *id.* at 831–33, 106 S.Ct. at 1590–91 (Blackmun, J., concurring). To establish a deprivation of due process, the petitioners need only show that the circumstances "would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear, and true between the state and the accused." *Tumey,* 273 U.S. at 532, 47 S.Ct. at 444; *accord Aetna,* 475 U.S. at 822, 106 S.Ct. at 1585; *Ward,* 409 U.S. at 60, 93 S.Ct. at 83; *Del Vecchio,* 31 F.3d at 1372, 1373. Proof that Maloney was motivated by virtue of his bribe taking to favor the prosecution and disfavor the defense in unfixed cases would permit, if not compel, the inference that Maloney's adverse rulings against Bracy and Collins were animated by a pernicious intent on Maloney's part (*see* Fed. R.Evid. 404(b)) and would more than satisfy the standard the Supreme Court has enunciated.

Habeas Rule 6(a) requires only that the petitioner demonstrate "good cause" to engage in discovery, and Bracy and Collins have certainly done so here. In view of the jury's verdict against Maloney, it is undisputed that he was accepting bribes at the very time that Bracy and Collins came to trial. Although there is no suggestion that money oiled the wheels of justice in this case, my colleagues concede the plausibility of the notion that "a judge's corruption is likely to permeate his judicial conduct rather than be encapsulated in the particular cases in which he takes bribes." *Ante* at 689. Putting aside for the moment contamination of the judge's philosophy, it seems to me likely that any judge who accepts bribes and wishes to remain on the bench will think in strategic terms about his other cases. As Chief Judge Posner points out, one might wonder whether it would really have been in Maloney's interest to assume a pro-prosecution mantle in unfixed cases, lest the occasional acquittal purchased from him look out of character. *Ante* at 689–90. But the time for such deliberation is after an evidentiary hearing on the matter, when the petitioners have had the opportunity to find and present whatever evidence there may be to establish any practice Maloney may have followed. Swano's testimony provides some evidence in that regard, and there may be more. Without giving Bracy and Collins the opportunity to present that evidence to Judge Hart, their claim of conflict can only be resolved on the basis of speculation, as my colleagues agree. *Ante* at 690. In view of the grave and structural nature of the petitioners' claim, not to mention the fact that this is a capital case, which "magnifies the appearance of impropriety," (*ante* at 689), the petitioners are entitled to more from us.

My colleagues note that Bracy and Collins have long had access to some of the information that they profess an interest in exploring—the records of other trials over which Maloney presided, and the record of Maloney's own trial, for example—but have not pointed to anything that bolsters their claim of partiality. *Ante* at 691. But if petitioners can be faulted for not making the most of the available material, we can be faulted for being naive about what the cold page of a trial record will reveal. A judge who wishes to be

tough on the defendant need not adopt the manner of the Tasmanian Devil to do it. Maloney was by no account stupid. When he sold an acquittal, he wanted facts that he could hang his hat on (*e.g.*, Maloney Tr. 2571, 2669–70, 2682); and we have no reason to doubt that if he wanted to cultivate a pro-prosecution record to protect his interests as a bribe taker, he had the ability to do so discretely, without appearing to have abused his discretion as a trial judge. Cases are fixed not in the courtroom but in bars, bath-rooms, and back hallways. If there is evi-dence of the kind Bracy and Collins hope to find, it is in the hands of persons familiar with these venues of injustice. Both Malo-ney and his bagman McGee are continuing their version of "stand[ing] tall" (*see United States v. Maloney*, 71 F.3d at 651–52), but Swano, Robert Cooley, and others may have something material to say, and the U.S. At-torney may be of some help in identifying whom the petitioners should approach. But it is likely that no one is going to talk without a subpoena, and petitioners should not be deprived of that instrument.

We are venturing into a realm noir with which, I may say with confidence, none of us is on intimate terms. We cannot simply assume that "the probability is slight" that discovery will yield Bracy and Collins any-thing. *Ante* at 691. Let them try. If their discovery proves fruitless, we can at least take comfort in the knowledge that we have given them every opportunity to prove that Maloney's corruption deprived them of a fair trial. We cannot, after all, have it both ways: we cannot criticize Bracy and Collins for speculation and at the same time deprive them of the chance to render their theory anything more. I understand that Illinois has an interest in the finality of its judg-ments, and allowing the discovery that the petitioners seek would, if nothing else, por-tend a significant delay in the implementa-tion of their death sentences. But having left Bracy and Collins to the mercies of a corrupt judge, the State should not be heard to complain in this matter. (In fact, its brief is utterly silent on this point.) The people of Illinois have as great an interest in the integ-rity of capital trials as Bracy and Collins do.

2.

My disagreement with the majority goes deeper than the question of discovery, how-ever. In the end, I agree with Collins and Bracy that proof of the impact Maloney's corruption had, or probably had, on the peti-tioner's trial is unnecessary. We do not know, and we likely will never know, what Maloney thought about Bracy and Collins. But we have a pretty clear picture of how he viewed justice. The price tag may have var-ied, but as Maloney's conviction proves, jus-tice was for sale in Maloney's courtroom to the defendants who could afford to pay, even when they were charged with the most hei-nous of crimes. That fact carries far more significance than the majority is willing to recognize. As this court acknowledged in *Del Vecchio*, in considering whether a biasing influence requires the disqualification of a judge, "we begin ... by presuming 'the hon-esty and integrity of those serving as adjudi-cators.' " 31 F.3d at 1375 (quoting *Withrow v. Larkin*, 421 U.S. 35, 47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975)). That presump-tion, as my colleagues acknowledge, is "obvi-ously inapplicable here." *Ante* at 688. Ma-loney was not Louis Garippo, an esteemed and honest judge whose impartiality was ar-gued to have been potentially compromised by his prior involvement with the defendant as a prosecutor. *See Del Vecchio*, 31 F.3d at 1375–80 (majority); *id.* at 1398 (Cummings, J., dissenting); *id.* at 1399 (Cudahy, J., dis-senting); *id.* (Ripple, J., dissenting). Nor was he even Otto Kerner, a judge whose crimes pre-dated his service on the bench. *See United States v. Isaacs*, 493 F.2d 1124 (7th Cir.), *cert. denied*, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 and *cert. denied*, 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146 (1974). Maloney was a criminal who, as a judge, transformed his very office into a racketeering enterprise.

Faced with the possibility of vacating nu-merous convictions obtained in Maloney's courtroom, we would like to believe that he was capable of the impartiality that the Fourteenth Amendment requires when no money changed hands. But how can we? Once he embarked on the path of bribe tak-ing, Maloney had forsaken his judicial oath.

Justice was a mere commodity to him, defendants nothing more than a profit center. His deviation from the path of righteousness was not, moreover, momentary and uncharacteristic; it was cold, calculated, and spanned a period of years, if not the entirety of his tenure on the bench. Thus, Maloney's "bias," if we can call it that, cannot be conveniently compartmentalized. *Cf. Diversified Numismatics, Inc. v. City of Orlando, Florida,* 949 F.2d 382, 385 (11th Cir.1991) (per curiam). We may no more treat Maloney as an impartial arbiter for constitutional purposes than a delusional megalomaniac who locks a judge in the closet, dons a black robe, and hoodwinks everyone with a credible impersonation of Oliver Wendell Holmes. Maloney's willingness to exchange money for the freedom of those charged with the most abhorrent crimes displayed his scorn for the very concept of justice.

By demanding proof that Maloney's corruption either had or likely had an identifiable impact on the petitioners' trial, we fail to come to grips both with the gravity of Maloney's offense and with the constitutional imperative that the accused be tried before a judge of integrity and impartiality. "[T]o perform its high function in the best way, 'justice must satisfy the appearance of justice.'" Aetna, 475 U.S. at 825, 106 S. Ct at 1587 (quoting *Murchison,* 349 U.S. at 136, 75 S.Ct. at 625). We said in *Del Vecchio* that "bad appearances alone [do not] require disqualification" (31 F.3d at 1372), but that an external influence requires the judge's disqualification when "the influence[ ] involved str[ikes] at the heart of human motivation, that an average man would find it difficult, if not impossible, to set the influence aside" (*id.* at 1373). My colleagues and I have been

discussing Maloney's bribetaking as just another "bias" or "influence," something external to his personality, or at least some severable part of it, that at most "might" have given him the "incentive" to behave in a particular fashion on occasions when he was not bribed. But there is a more malevolent side to Maloney's offense that cannot be ignored. Maloney's bribetaking removes him from the category of the "average" man we addressed in *Del Vecchio.* We are speaking in this case about what motivates a *criminal,* and this implicates a far darker set of impulses than we confront in the usual bias case. The question we should be asking ourselves is not what impact the lack of a bribe had on Maloney's decisionmaking in a particular case, but what his willingness to accept a bribe tells us about his view of judging. Maloney proved himself willing to acquit defendants charged with capital offenses for a few thousand dollars. The victims of those crimes, their families, the people of Illinois, the concept of justice, were apparently worth no more to him. Why should we assume that defendants were worth anything more to Maloney? How, in particular, can we trust Maloney to have treated a defendant fairly when that defendant had not offered him any money?[1] If due process means anything, I think we must assume that Maloney's corruption pervaded his work as a judge. The Supreme Court could not have put it more clearly: "[W]hen the trial judge is discovered to have had some basis for rendering a biased judgment, his actual motivations are hidden from review, and we must presume that the process was impaired." *Vasquez v. Hillery,* 474 U.S. 254, 263, 106 S.Ct. 617, 623, 88 L.Ed.2d 598 (1986).[2]

---

1. Consider the words of a government attorney who prosecuted Maloney:

 As a judge [Maloney] was tough and hardnosed. Many prosecutors liked working in his courtroom because he was tough and hardnosed. But one of the things that I have heard over and over again from lawyers in the community is that he took it far too far; that he was ruthless; that he heartlessly meted out sentences without any compassion. [T]he only time there was compassion that we can see has to do with the times in which money was being passed.

 *United States v. Thomas J. Maloney and Robert McGee,* No. 91 CR 477, Sentencing Tr. 559–60

(N.D.Ill. July 21, 1994) (remarks of Assistant United States Attorney Scott Mendeloff).

2. I recognize, of course, that there are prosecution-minded judges and defense-minded judges and that although these predispositions can have a very real impact on the kind of trial the parties receive, we ordinarily do not recognize this bias as a constitutional deprivation. *See ante* at 688; *see also Del Vecchio,* 31 F.3d at 1390–91 (Easterbrook, J., concurring). Judges are, after all, human beings, and we dare not fool ourselves into thinking that any judge can completely divorce herself from her own experiences and predilections. *Id.* at 1372 (majority); *see also* Benjamin

Although Maloney's crimes reveal no fealty to his oath as a judge, my colleagues nonetheless refuse to relinquish the presumption that he acted fairly when not bribed. The notion that "a judge who accepts bribes in some cases is corrupt in all" is not "a sufficiently compelling empirical proposition," they say, to treat this case as if the government had bribed Maloney to convict the petitioners. *Ante* at 690. But this is not an empirical matter. We cannot assign a value of $x$ to a judge's ability to be fair, divide it by $y$ ($y$ representing Maloney's bribe taking), and determine whether the result is less than the constitutionally minimal level of impartiality, $z$. Like so many other elements of our democracy, justice requires a leap of faith: faith that the defendant is in fact presumed innocent until proven guilty beyond a reasonable doubt; faith that the prosecutor and defense counsel alike will act as zealous advocates for their principals within the confines of law and ethics; faith that the trial judge will favor no party but will strive "to hold the balance nice, clear, and true between the state and the accused." *Tumey,* 273 U.S. at 532, 47 S.Ct. at 444. Maloney's crimes shatter that faith. We have no reason to believe that had Bracy and Collins possessed sufficient funds and willing attorneys, they could not have bought acquittals from Maloney. That alone suggests that Maloney's was not the court of "law" to which Bracy and Collins were entitled as the forum for their trial. We do have reason, based on Swano's testimony, to believe that Maloney's corruption extended beyond the cases in which he accepted a bribe, and that Maloney saw unfixed cases as an opportunity to "screw" the defendant and thereby further his own ends as a bribe taker. No "empirical" proof is necessary to demonstrate that the petitioners did not stand equal before the law in Maloney's courtroom.

N. Cardozo, The *Nature of the Judicial Process* 168–69 (Yale Univ. Press 1921). But the distinction between the honest judge, who labors to varying degrees of success to rise above his prejudices, and the dishonest judge, who willingly abandons his oath and yields to the coarsest of proclivities, cannot be overstated. We simply have no business assuming that a judge who is willing to acquit an accused murderer for a few thousand dollars will make any effort to protect

I realize, of course, that Bracy and Collins were convicted by a jury, not by Maloney. Jurors have minds of their own; they can and do defy the expectations of the judge. That is but one reason that the jury has been viewed by some as "the very palladium of free government." *The Federalist* No. 83, at 499 (Alexander Hamilton) (Clinton Rossiter ed. 1961); *see Duncan v. Louisiana,* 391 U.S. 145, 155–58, 88 S.Ct. 1444, 1451–52, 20 L.Ed.2d 491 (1968). But we cannot ignore the influence that the judge retains even in a jury trial. *See Walker v. Lockhart,* 726 F.2d 1238, 1259 (8th Cir.1984) (en banc) (Bright, J., dissenting), *cert. dismissed,* 468 U.S. 1222, 105 S.Ct. 17, 82 L.Ed.2d 912 (1984), and *cert. denied,* 478 U.S. 1020, 106 S.Ct. 3332, 92 L.Ed.2d 738 (1986). I do not refer so much to the ability of the judge to communicate his opinions to the jury through raised eyebrows, choice bits of sarcasm, and questioning of the witnesses that strays into advocacy, although this happens. *E.g., Dellinger,* 472 F.2d at 386–88; *see also United States v. Filani,* 74 F.3d 378, 387 (2d Cir.1996); *Bufford v. Rowan Cos.,* 994 F.2d 155, 159 (5th Cir.1993). I mean the extraordinary ability of the trial judge to shape the trial itself. It is she who decides what evidence the jury may hear, how counsel may behave in front of the jury, what arguments may be made, how they may be made, what legal principles the jury must apply, and even, to a significant degree, who will sit on the jury. Thus, even when the verdict is not entrusted to her, a partial judge retains great influence, if not directly upon the jury, then upon the myriad events that culminate in the jury's decision. *See Tyson v. Trigg,* 50 F.3d 436, 439 (7th Cir. 1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 697, 133 L.Ed.2d 655 (1996).[3]

Our own ability to monitor the influence of the trial judge, and to discern the taint of

the rights of a defendant who has not greased his palm.

3. In this case there were plenty of issues that implicated Judge Maloney's discretion and thus his ability to influence the case against Bracy and Collins: the credibility questions presented by the petitioners' motion to suppress key evidence; the bolstering of prosecution witnesses; the collateral impeachment of defense witnesses;

partiality, is narrowly circumscribed. Appellate review of the mundane decisions that can make or break a party's case (the exclusion or admission of a key piece of evidence, for example) typically is quite limited. *E.g., United States v. Marshall,* 75 F.3d 1097, 1109 (7th Cir.1996) (evidentiary issues); *United States v. Pulido,* 69 F.3d 192, 204 (7th Cir.1995) (limitations on cross-examination); *United States v. Fish,* 34 F.3d 488, 495 (7th Cir.1994) (request for continuance); *United States v. $94,000.00 in U.S. Currency,* 2 F.3d 778, 788 (7th Cir.1993) (questions posed on voir dire). In the rare instance that we find error, it is more often than not deemed harmless. *E.g., Jones v. Page,* 76 F.3d 831, 855–56 (7th Cir.1996). Even errors of constitutional dimension may be labelled benign on review. *Tyson,* 50 F.3d at 446–47. Theoretically, we could require a more searching review of the record when there is evidence that the trial judge was corrupt, but we would be fooling ourselves to think that even our best efforts would suffice to expose the ways in which the judge's criminal behavior may have tainted the trial. *See United States v. Guglielmini,* 384 F.2d 602, 605 (2d Cir.1967) ("Few claims are more difficult to resolve than the claim that the trial judge, presiding over a jury trial, has thrown his weight in favor of one side to such an extent that it cannot be said that the trial has been a fair one."), *cert. denied,* 400 U.S. 820, 91 S.Ct. 38, 27 L.Ed.2d 48 (1970). So much goes on in the courtroom that the written record can never reveal. Why else do we routinely grant so much deference to the trial judge, who sees and hears the witnesses first hand, who supervises the trial from start to finish, who can best gauge the impact of any development upon the jury before him? Our acquiescence in the decisions of the trial court is dictated as much by pragmatism as by principle.

It is no answer to the charge of corruption that Maloney's discretionary rulings on their face appear to fall within the realm of reason. *See ante* at 690. All that means is that a reasonable judge might have rendered the same rulings. But we assume that the reasonable judge does not act for malignant ends, that she exercises

> a sound judicial discretion, enlightened by intelligence and learning, controlled by sound principles of law, of firm courage combined with the calmness of a cool mind, free from partiality, not swayed by sympathy nor warped by prejudice nor moved by any kind of influence save alone the overwhelming passion to do that which is just.

*Davis v. Boston Elevated Ry. Co.,* 235 Mass. 482, 126 N.E. 841, 844 (1920); *see also* Henry J. Friendly, *Indiscretion About Discretion,* 31 EMORY L.J. 747, 784 (1982) ("discretionary choices are not left to a court's 'inclination, but to its judgment; and its judgment is to be guided by sound legal principles'") (quoting *United States v. Burr,* 25 F. Cas. 30, 35 (C.C.Va.1807) (No. 14,692d) (Marshall, C.J.)). If, on the other hand, a judge exercises her discretion for invidious reasons, she has exceeded her authority. *See* 1 Steven Alan Childress and Martha S. Davis, FEDERAL STANDARDS OF REVIEW, § 4.01 at 4–2 through 4–3 (2d ed. 1991); *Wong Wing Hang v. INS,* 360 F.2d 715, 719 (2d Cir.1966) (Friendly, J.). But, except in the rare case in which the judge's agenda is obvious, we cannot expect to autopsy a trial and find evidence that the cancer of the judge's corruption has invaded her decisionmaking. When the majority finds it "unlikely" that the discretionary trial rulings of which Bracy and Collins complain were the product of Maloney's corruption (*ante* at 690), it is doing exactly what the petitioners are faulted for doing: speculating.

We cannot, therefore, hide behind the jury's verdict. We simply cannot know what impact Maloney's corruption may have had on the trial and on the jury's decision. *Cf. Vasquez,* 474 U.S. at 260–64, 106 S.Ct. at 622–24 (discrimination in grand jury not rendered harmless by subsequent trial). The evidence against Bracy and Collins may seem

---

improper prosecution argument to the jury; the denial of a continuance prior to the sentencing hearing; and the refusal to sever the sentencing hearings. Viewed singly, none of Maloney's rulings on these issues may seem critical to the outcome of the case; but as my colleagues concede, the cumulative effect of these rulings may be "greater than we imagine." *Ante* at 690 (citing *Tyson,* 50 F.3d at 439).

to us overwhelming, but that does not strip them of their right to due process. "No matter what the evidence was against [them], [they] had the right to have an impartial judge." *Tumey*, 273 U.S. at 535, 47 S.Ct. at 445. Nor, as a matter of principle, can the process of presumably unbiased appellate review cure the taint of Maloney's corruption; Bracy and Collins were "entitled to a neutral and detached judge in the first instance." *Ward*, 409 U.S. at 61–62, 93 S.Ct. at 84.

Ultimately, although my colleagues concede the plausibility of the notion that a judge's corruption cannot be confined to the cases in which he accepts a bribe, they decline to embrace it, finding the consequences "unacceptable." *Ante* at 689. Maloney alone presided over some 6,000 cases. *See United States v. Thomas J. Maloney and Robert McGee*, No. 91 CR 477, 1994 WL 96673, Sentencing Tr. 571 (N.D.Ill. July 21, 1994). My colleagues believe, and perhaps rightly so, that we cannot vacate the convictions of Bracy and Collins without calling into doubt the many other judgments entered not only by Maloney (the only Illinois judge thus far convicted of corruption in murder prosecutions), but also the seventeen other Cook County judges found guilty of taking bribes. *Ante* at 689. Given the expanse of time that has passed since these judgments were entered, were retrials ordered across the board, there are doubtless many guilty individuals, murderers even, who would go free. It is an appalling prospect. But we must not allow ourselves to become paralyzed by the possibilities. We decide today not the validity of every judgment ever rendered by a corrupt judge, but the fate of two individuals who are about to pay the ultimate criminal penalty without having been afforded the most basic rudiment of due process. What are we to say to Bracy and Collins, that they had the right to an honest, impartial judge but that the breadth of past corruption in the Illinois judiciary makes it too costly for us to enforce that right? Are they to become the latest victims of Maloney's bribe taking, and we his accomplices after the fact? The Constitution was not written for easy cases and likeable defendants, and we are sworn to uphold it no matter what the result. Knowing full well the perils that may confront us if we insist that defendants be given trials before honest judges, I believe we have no choice but to take the first step down that path here. We cannot turn our backs on the Constitution, especially when the petitioners' very lives are at stake. If nothing else, "[d]eath is factually different. Death is final. Death is irremediable. Death is unknowable." Anthony G. Amsterdam, Tr. of oral argument, *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (No. 74–6257), quoted in MAY IT PLEASE THE COURT ... 233 (Peter Irons & Stephanie Guitton eds. 1993); *see also Furman v. Georgia*, 408 U.S. 238, 306, 92 S.Ct. 2726, 2760, 33 L.Ed.2d 346 (1972) (Stewart, J., concurring).

### 3.

The quality of justice we can claim to have achieved in this nation is not measured by what our best judges can do but by what the worst of our judges have done. Today we say that Thomas Maloney's handiwork is good enough. An Illinois defendant, it appears, is entitled to appear before a judge who is not under *indictment* for bribery, Ill. S.Ct. R. 56(a)(1), but today's opinion deprives him of the right to appear before a judge who is not *engaged* in bribery. Bracy and Collins will thus have to be content with the judgment of a criminal. I do not know which I find more shocking: the base quality of justice that Bracy and Collins received in the Illinois courts, or our holding today that the Constitution requires no more.

### 4.

I must, finally, say a word about the majority's invocation of *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). *Ante* at 689. *Teague* generally bars the application of "new rules" of federal law on habeas review. But *Teague*'s proscription is not jurisdictional, *Collins v. Youngblood*, 497 U.S. 37, 41, 110 S.Ct. 2715, 2718, 111 L.Ed.2d 30 (1990), and if the state fails to invoke *Teague*, we may, but are not compelled, to do so ourselves, *Goeke v. Branch*, — U.S. —, —, 115 S.Ct. 1275, 1276, 131 L.Ed.2d 152 (1995) (per curiam). *See Stewart v. Lane*, 60 F.3d 296, 304–05 (7th Cir.

1995) (Ripple, J., concurring), *supplemented on reh'g,* 70 F.3d 955, *petition for cert. filed* (Jan. 16, 1996) (No. 95–7444). The state has never cited *Teague* as a defense to the petitioners' claim of judicial corruption, and I am not convinced that the circumstances of this case warrant our sua sponte reliance upon it as an alternate basis for denying the petitioners the relief they seek. *See Stewart* at 304 (concurrence) ("Because, in a capital case, invocation of *Teague* can often mean the difference between life and death for the petitioner, we need to be particularly circumspect as to when we shall invoke *Teague* sua sponte."). The majority offers no reason why *Teague* is particularly apposite here, and I discern none. Since when is it news that the accused has the right to be tried before an honest, impartial judge? I had rather thought that to be a cornerstone of our system of justice. And indeed, Supreme Court precedent reveals the notion to be anything but novel. The Court's 1927 decision in *Tumey,* for example, holds that when a judge has a financial incentive to see the defendant convicted, he is not sufficiently impartial for constitutional purposes. 273 U.S. at 531–35, 47 S.Ct. at 444–45. This case is, in a real sense, but a factual variant of *Tumey.* I grant that no court has yet found it necessary to hold that a judge engaged in serial bribetaking is not the impartial adjudicator that the Constitution requires, and in that respect one might argue that the rule the petitioners posit "was not *dictated* by precedent existing at the time [their] conviction[s] became final." *Caspari v. Bohlen,* —— U.S. ——, ——, 114 S.Ct. 948, 953, 127 L.Ed.2d 236 (1994) (quoting *Teague,* 489 U.S. at 301, 109 S.Ct. at 1070) (emphasis in *Teague*). But surely common sense counts for something in the *Teague* analysis. The Greylord prosecutions had not yet taken place in 1981 when Bracy and Collins were tried, but the State of Illinois cannot claim to have been ignorant of the notion that bribery is illegal and that judges who accept bribes belong in prison, not on the bench. There is, in short, nothing surprising in the petitioners' claim. The prospect of retrying Bracy and Collins (not to mention other defendants convicted by or before Maloney) is an onerous one for the State, but that burden has nothing to do with the novelty of the principle that a defendant is entitled to a judge who is not on the take. Our invocation of *Teague* in this circumstance makes that precedent look less like a shield protecting the State from the retroactive application of new rules than a sword depriving habeas petitioners of constitutional rights that have long been recognized.

5.

Eighteen judges of the Cook County Circuit Court have been convicted of corruption in the last decade. We would like to think that rampant corruption on the Cook County bench is a relic of the past. But it will not be, it cannot be, so long as we refuse to recognize just how fundamentally at odds this corruption is with the constitutional guarantee of due process. Like Terrence Hake, who risked his own career to expose the criminals clothed in the robes of judges, we too have a role to play in restoring integrity to the bench. We cannot embrace the judicial services of outlaws without deepening the stain their crimes have already left on our courts.

I respectfully dissent.