**UNITED STATES of America ex rel. Roger COLLINS, Petitioner,**

**v.**

**George WELBORN, Warden, Menard Correctional Center, Respondent.**

**United States of America ex rel. William Bracy, Petitioner,**

**v.**

**Richard Gramley, Warden, Pontiac Correctional Center, Respondent.**

Nos. 93 C 5282, 93 C 5328.

United States District Court, N.D. Illinois, Eastern Division.

Nov. 24, 1999.

Robert Hugh Farley, Jr., Robert H. Farley, Jr., Ltd., Naperville, IL, Daniel R. Collins, Ramsell & Armamentos, Wheaton, IL, Stephen E. Eberhardt, Tinley Park, IL, for Roger Collins.

Steven Joseph Zick, Terence Madsen, Paul James Chevlin, Illinois Attorney General's Office, Chicago, IL, William Browers, Assistant Attorney General, Chicago, IL, for George Welborn.

John Ladell Stainthorp, Peoples Law Offices, Chicago, IL, Gilbert H. Levy, Seattle, WA, Daniel R. Collins Ramsell & Armamentos, Wheaton, IL, for William Bracy.

Terence Madsen, Paul James Chevlin, Illinois Attorney General's Office, Chicago, IL, for Richard Gramley.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

HART, District Judge.

### I. BACKGROUND

#### A. State Proceedings

Late during the night of November 12, 1980, Frederick Lacey, R.C. Pettigrew and Richard Holliman were kidnapped, robbed, and shot to death execution-style near a viaduct in Chicago, Illinois. In March of 1981, Roger Collins, William Bracy, and Murray Hooper were indicted and charged with armed robbery, aggravated kidnapping, and murder of the three victims. Hooper, who gave a statement inculpating Collins and Bracy, was tried separately.[1] All three were tried before Judge Thomas J. Maloney in the Circuit Court of Cook County, Illinois.

Morris Nellum, who admittedly took part in the crimes, was the principal witness for the prosecution of Bracy and Collins. He was allowed to plead guilty to concealing homicidal deaths and was sentenced to a short prison term. Nellum testified that the victims had been bound and taken from an apartment, driven to a viaduct, and there shot to death with pistols and a shotgun. Two other witnesses placed Collins, Hooper, and Nellum at the location of the kidnapping, an apartment building, and noticed that the victims appeared to be bound when they left the building. Nellum identified a place where weapons used in the crime were thrown into Lake Michigan. The motive of the crimes was robbery.

---

**1.** Hooper was convicted of armed robbery, aggravated kidnapping, and murder and was sentenced to death. The Supreme Court of Illinois vacated the death sentence and remanded the case for a new sentencing hearing. *People v. Hooper,* 133 Ill.2d 469, 142 Ill.Dec. 93, 552 N.E.2d 684 (1989), *cert. denied,* 498 U.S. 911, 111 S.Ct. 284, 112 L.Ed.2d 239 (1990) (*"Hooper II"*). On remand, before a different judge, Hooper was again sentenced to death. On direct appeal the sentence was affirmed. *People v. Hooper,* 172 Ill.2d 64, 216 Ill.Dec. 633, 665 N.E.2d 1190, *cert. denied,* 519 U.S. 969, 117 S.Ct. 396, 136 L.Ed.2d 311 (1996) (*"Hooper III"*).

A .38–caliber Charter Arms revolver and a .357 Rugger revolver were recovered from Lake Michigan and identified. The .38–caliber Charter Arms revolver was stolen from Christina Nowell by Bracy, who stated to her, when she sought its return, that "he had murdered some people with [her gun] and threw it in the Chicago River." The Charter Arms revolver was traced by serial number as the one Bracy stole from Nowell. Nowell also testified that she was present when a woman gave Bracy a sawed-off shotgun in a bar. Expended shotgun shells were found at the location of the murders.

The testimony of the witnesses is set forth in detail in opinions of the Supreme Court of Illinois, see People v. Collins, 106 Ill.2d 237, 87 Ill.Dec. 910, 478 N.E.2d 267, cert. denied, 474 U.S. 935, 106 S.Ct. 267, 88 L.Ed.2d 274 (1985) ("Collins I"); People v. Collins, 153 Ill.2d 130, 180 Ill.Dec. 60, 606 N.E.2d 1137 (1992), cert. denied, 508 U.S. 915, 916, 113 S.Ct. 2355, 124 L.Ed.2d 263 (1993) ("Collins II"), the Court of Appeals for the Seventh Circuit, see Bracy v. Gramley, 81 F.3d 684 (7th Cir.1996) ("Bracy I"), rev'd in part, 520 U.S. 899, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997) ("Bracy II"), and this court, see United States ex rel. Collins v. Welborn, 868 F.Supp. 950 (N.D.Ill.1994) ("Collins III"), aff'd, Bracy I, rev'd in part, Bracy II. As previously stated by the Court of Appeals and this court, the evidence of guilt was compelling. Bracy I, 81 F.3d at 687; Collins III, 868 F.Supp. at 978.

Relevant to the sentencing hearing of Bracy was evidence that, on December 31, 1980 in Arizona, Bracy and Hooper murdered two people and attempted to murder a third person. That was less than two months following the murders in Illinois.[2] Bracy and Hooper were hired to commit the Arizona murders. See Bracy III, 703 P.2d at 481; Hooper I, 703 P.2d at 494.

The petitioners were convicted of armed robbery, aggravated kidnapping, and murder. A jury found the existence of statutory aggravating factors and separately concluded that there were no mitigating factors sufficient to preclude the imposition of the death penalty. Petitioners were sentenced to death and concurrent 60–year prison terms for armed robbery and aggravated kidnapping. On direct appeal to the Supreme Court of Illinois, the conviction and sentences were affirmed, except that the kidnapping sentences were reduced to 30 years because the kidnapping was not for ransom. Collins I, supra. Post-conviction relief was subsequently denied. Collins II, supra.

### B. Federal Proceedings

Bracy and Collins filed federal habeas corpus petitions which were consolidated in this court. After their state court trial, Judge Maloney was indicted on federal charges and subsequently convicted of racketeering offenses involving the acceptance of bribes to fix criminal cases. See United States v. Maloney, 71 F.3d 645 (7th Cir.1995), cert. denied, 519 U.S. 927, 117 S.Ct. 295, 136 L.Ed.2d 214 (1996).

Petitioners raised a number of claims in their federal habeas corpus petitions including bias on the part of the trial judge. Petitioners did not attempt to bribe Maloney nor did he solicit a bribe from them. Petitioners contended, however, that Maloney compensated for his defendant-favoring rulings in cases involving bribes by being biased against defendants who did not pay bribes. Petitioners did not contend that they had sufficient evidence to presume or to show what they called actual "compensatory bias." Instead, they contended that they were entitled to additional discovery in order to attempt to prove Maloney's compensatory bias against them. It was held that they had failed to show good cause for discovery,

---

**2.** Bracy is under a death sentence for the two murders in Arizona. See State v. Bracy, 145 Ariz. 520, 703 P.2d 464 (1985), cert. denied, 474 U.S. 1110, 106 S.Ct. 898, 88 L.Ed.2d 932 (1986) ("Bracy III"); State v. Hooper, 145 Ariz. 538, 703 P.2d 482 (1985), cert. denied, 474 U.S. 1073, 106 S.Ct. 834, 88 L.Ed.2d 805 (1986) ("Hooper I").

*Collins III*, 868 F.Supp. at 990–91, and relief was denied on all claims. *Id.* at 967–94. The Court of Appeals for the Seventh Circuit affirmed by a divided vote. *See Bracy I.* The Supreme Court of the United States granted certiorari limited to the issue of whether petitioner Bracy[3] had made a sufficient showing of good cause for discovery. Holding that he had, it reversed and remanded for discovery on the due process claim of actual judicial bias. *See Bracy II.*

### C. Discovery and Trial Issues

On remand to this court, petitioners were permitted to undertake document discovery and to obtain deposition testimony. Petitioners sought to depose Maloney, who is in federal custody in California. Maloney refused to give a deposition, claiming not to have had sufficient notice. A writ of habeas corpus ad testificandum was issued *sua sponte* to bring Maloney before this court for the purpose of taking his testimony. Maloney's testimony is now part of the record in this case.

After completing discovery, both sides moved for summary judgment. Finding that material issues of fact existed with respect to issues of actual judicial bias, summary judgment was denied. *See United States ex rel. Collins v. Welborn*, 49 F.Supp.2d 597 (N.D.Ill.1999) (*"Collins IV"*).

In *Collins IV*, 49 F.Supp.2d at 602–04, it was held that the rule of *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), does not bar petitioners' claim of actual judicial bias. This holding was distinguished from indications in *Bracy I*, 81 F.3d at 689–90, that a claim based on an appearance of impropriety (not actual bias) would be barred by *Teague*. *Compare also Bracy I*, 81 F.3d at 704 (Rovner, J., dissenting) (claim that judge was actually partial not barred by *Teague* ).

In a case decided by the Court of Appeals after the Supreme Court's opinion in

*Bracy II*, the Court stated with reference to *Bracy II* that proof "that a judge is bribed in some cases does not establish that he was not impartial in others," but rather warrants further inquiry. *Cartalino v. Washington*, 122 F.3d 8, 10 (7th Cir.1997). It is also clear from *Cartalino* that the burden of proof of actual bias did not shift from the petitioners. *Cf. id.* at 11. Whether and under what circumstances a judge's bribetaking in other cases will warrant relief in a case where money did not change hands was said to await the development of a complete record in *Cartalino*.

Bracy filed an affidavit with respect to the background, appointment, and conduct of his trial attorney. This affidavit is relevant both to the scope of the permitted discovery and the findings to be made by this court on the issue of Maloney's judicial bias. Bracy stated that his trial attorney was a former associate in Maloney's corrupt law practice and was appointed with the understanding that he would not object to a prompt trial so as to deflect attention from cases in which Maloney had taken bribes. The Supreme Court stated:

> We emphasize, though, that petitioner supports his discovery request by pointing not only to Maloney's conviction for bribe taking in other cases, but also to additional evidence, discussed above, that lends support to his claim that Maloney was actually biased in petitioner's own case. That is, he presents "specific allegations" that his trial attorney, a former associate of Maloney's in a law practice that was familiar and comfortable with corruption, may have agreed to take this capital case to trial quickly so that petitioner's conviction would deflect any suspicion the rigged *Rosario* and *Chow* cases might attract.

*Bracy II*, 520 U.S. at 909, 117 S.Ct. 1793.

In describing the discovery sought, the Supreme Court stated that petitioner "re-

---

**3.** The Supreme Court granted certiorari in Bracy's appeal. Collins' appeal was subsequently remanded for further consideration in light of the opinion in the Bracy appeal. *See*

*Collins v. Welborn*, 520 U.S. 1272, 117 S.Ct. 2450, 138 L.Ed.2d 209 (1997). The Supreme Court's *Bracy II* opinion has been applied equally to both petitioners.

quested (1) the sealed transcript of Maloney's trial; (2) reasonable access to the prosecution's materials in Maloney's case; (3) the opportunity to depose persons associated with Maloney; and (4) a chance to search Maloney's rulings for a pattern of pro-prosecution bias." *Id.* at 902, 117 S.Ct. 1793. The petitioners have been accorded the requested discovery and the case is now before this court for the entry of findings of fact and conclusions of law with respect to the issue of actual judicial bias.

This court must accord a presumption of correctness to any factual findings of the State courts. 28 U.S.C. § 2254(d)(1) (1993). There are no State court factual findings with respect to the issue of judicial bias, however.

The parties agreed that, other than Maloney's testimony, no live witnesses would be presented. At the time the parties moved for summary judgment, Maloney had not testified and William Swano had invoked the Fifth Amendment. Thereafter, the parties obtained Maloney's testimony, submitted some of the record from Maloney's trial and sentencing, transcripts, and court records from other cases tried before Maloney, some non-public documents obtained from the United States Attorney, and deposition testimony from associates of Maloney and attorneys involved in petitioners' trial. The parties elected to rely on Swano's testimony from the Maloney trial and not raise the question of whether Swano should be compelled to provide new testimony beyond his invocation of the Fifth Amendment.

## II.  FINDINGS OF FACT

Based on the testimony, statement of uncontested facts, depositions, transcripts from other cases, the state court record of petitioners' prosecution, and exhibits submitted, the court finds the facts to be as follows:

### A.  Uncontested Facts

The parties have expressly represented that the following facts are uncontested:

1.  Following a jury trial in 1981, in the Circuit Court of Cook County, Illinois, Roger Collins and William Bracy were found guilty of armed robbery, aggravated kidnapping, and the murders of Frederick Lacey, R.C. Pettigrew, and Richard Holliman. A two-stage sentencing hearing was held at which the same jury found the existence of statutory eligibility factors and concluded there were no mitigating factors sufficient to preclude imposition of the death penalty. The trial judge, Thomas J. Maloney, sentenced Collins and Bracy to death.

2.  Bracy and Collins were arraigned on March 12, 1981.

3.  On May 6, 1981, Bracy's original attorney, Patrick Tuite, was given leave to withdraw on the ground that Bracy lacked funds to retain him.

4.  On June 2, 1981, Judge Maloney appointed Robert McDonnell to represent Bracy.

5.  On June 18, 1981, attorney McDonnell announced that he was ready for trial and demanded that a trial date be set.

6.  Collins' and Bracy's trial began July 20, 1981.

7.  The assistant state's attorneys that tried the case, Michael Goggin and Gregg Owen, pushed the case to trial as quickly as possible because they were concerned about the safety of prosecution witnesses.

8.  On July 29, 1981, the jury returned guilty verdicts as to both Collins and Bracy. Both defense attorneys moved for a postponement of the penalty phase. Judge Maloney denied that request.

9.  On July 31, 1981, the jury returned death verdicts as to both Collins and Bracy.

10.  In April 1993, Maloney was convicted in the United States District Court for the Northern District of Illinois of conspiracy, extortion, and obstructing justice. The indictment charged that Maloney accepted bribes to fix the results of five specific Cook County felony cases: *People v. Lenny Chow,* No. 81 C 4020; *People v.*

· *Owen Jones,* No. 81 C 9832; *People v. Ronald Roby,* No. 82 I 50244; *People v. Frank Calistro,* No. 82 C 8355; and *People v. Earl Hawkins & Nathson Fields,* No. 85 C 6555. Although the indictment did not specifically charge that Maloney accepted a bribe in a sixth case, *People v. Wilfredo Rosario,* No. 79 C 2469, evidence that a bribe was accepted in the case was introduced at Maloney's trial to demonstrate his membership in the conspiracy.

## B. Contested Facts

Based on the testimony, depositions, and exhibits received in evidence, including judicial notice of certain court records, the court further finds as follows:

### i. Direct Evidence of Bribe Payments

11. Thomas Maloney was appointed to the bench of the Circuit Court of Cook County by the Illinois Supreme Court in 1977 and retained that position until retirement in 1990. In 1991, he was indicted, together with attorneys Robert McGee and William Swano, on charges of racketeering, conspiracy, extortion under color of official right, and obstruction of justice in violation of 18 U.S.C. §§ 1962(d), 1962(c), 1951, and 1503. According to the jury's findings, during the time he was on the bench he agreed to fix four cases, including three murder cases, and obstructed justice in relation to the investigation of the bribes.

12. The case which forms the first racketeering act charged in the indictment is the case of *People v. Lenny Chow,* No. 81 C 4020, in which Maloney shared in $100,000 of bribes. Three defendants were acquitted in a bench trial in August of 1981. Robert Cooley was contacted by First Ward Alderman Fred Roti and Ward Secretary Pat Marcy to represent Chow, a hit man for the On Leong crime organization, as were two others charged with the shooting. When the victim died, the charge was changed to murder. Maloney required that his friend, attorney Herb Barsy, act as co-counsel. At trial, Maloney admitted a dying declaration, but found it unreliable and acquitted the defendants on August 13 and 14, 1981.

13. The second racketeering act is the bribes paid to fix the case of *People v. Ronald Roby,* No. 82 I 50244 (five deceptive practices charges), in which, as a result of a plea of guilty on September 3, 1982, the defendant was given probation. Roby's attorney, William Swano, made payments to Lucius Robinson. Robinson passed $2,300 to Maloney.

14. The third bribe charged occurred in the case of *People v. Owen Jones,* No. 81 C 9832. Jones was charged with felony murder after beating a man to death during a burglary. Swano was hired and contacted Robinson. Robert McGee approached Swano and became the bagman because Robinson had become "too hot." McGee told Swano that the best Maloney could do would be to acquit on felony murder, convict of voluntary manslaughter, and impose a nine-year term. Jones' mother agreed to pay Swano $4,000 to $5,000 for the fix. Judgment was entered and the nine-year sentence imposed on November 4, 1982.

15. The final bribe found by the jury involved a 1986 murder case, *People v. Earl Hawkins & Nathan Fields,* No. 85 C 6555. The defendants were members of the El Rukn street gang. Swano met McGee in January or February of 1986 to discuss a fix and arrived at a figure of $10,000. Swano collected $20,000 from the El Rukns to ensure some money for himself. By this time, the FBI had become suspicious of Maloney and was watching the case. This attention, coupled with the strength of the prosecution's case, prompted Maloney to return the bribe on June 26, 1986. Hawkins and Fields were found guilty and sentenced to death.[4]

---

4. The Supreme Court of Illinois affirmed the convictions on direct appeal. *People v. Fields,* 135 Ill.2d 18, 142 Ill.Dec. 200, 552 N.E.2d 791, *cert. denied,* 498 U.S. 881, 111 S.Ct. 228, 112 L.Ed.2d 182 (1990). However, the convictions were vacated after a postconviction hearing and a new trial was ordered. The Supreme Court of Illinois affirmed, holding that the judge's willingness to accept a bribe for acquittal denied defendants due process even though the bribe was returned and de-

16. In support of the conspiracy charge against Maloney, the government also introduced evidence of bribery in the case of *People v. Rosario,* No. 79 C 2469, which occurred in 1980. Maloney received a total of $2,500 with the final payment of $500 being paid on October 11, 1980. Swano paid Robinson. The motion to suppress was argued on October 17, 1980. On January 23, 1981 Maloney suppressed the confession of the defendant. The case was continued to June 17, 1981 and dismissed.

17. The jury did not find that the fifth bribe charged in the indictment was committed in the case of *People v. Calistro,* 82 C 8355. The events involving this case occurred in the period from August of 1982 to January of 1983. William Swano testified at the Maloney trial, however, that he appeared in the *Calistro* case after talking to Robert McGee. Swano testified that he paid $2,500 to McGee to bribe Maloney. After a plea of guilty, Maloney sentenced Calistro to probation.

18. In January of 1985, Swano represented James Davis in a robbery case before Maloney. It was Swano's opinion that the prosecution's case was weak and he recommended that the defendant waive a jury. The defendant was convicted. Swano was permitted to testify in the Maloney case that, it was his opinion after that experience that he would lose any bench trial before Maloney unless he paid the judge.

19. There are hearsay statements, in the Government's Maloney investigation files produced to petitioners, to the effect that Maloney accepted a bribe in the Rocco LaMantia murder case. LaMantia was acquitted by Maloney after a bench trial in April 1981. Michael Goggin, one of the assistant state's attorneys assigned the LaMantia trial, was informed by a cousin of the murder victim that a bribe had been paid to Maloney.

### ii. Appointment and Conduct of Bracy's Attorney

20. Bracy and Collins were arraigned on the charges in this case on March 12, 1981. Collins was represented by Irwin Frazin, Bracy by Patrick Tuite, and Hooper by John Cutrone. The case was assigned to Judge Barbaro. Cutrone moved for a substitution of judges and the case was assigned to Maloney. The parties appeared before Maloney and the case was continued by agreement to March 30, 1981. On that date, assistant state's attorney Goggin indicated that he had furnished defense counsel with Hooper's inculpating statement given before another assistant state's attorney, the grand jury testimony, a police report, and a copy of a post-mortem examination. The case was continued by agreement to April 15, 1981.

21. On April 15, 1981, Goggin tendered ballistic reports as well as a set of police reports to the defense. Maloney granted Cutrone's motion to withdraw on behalf of Hooper and the matter was continued to May 6, 1981.

22. On May 6, 1981, Tuite asked for leave to withdraw, explaining that Bracy did not have funds to hire private counsel. Bracy asked for two weeks to arrange for counsel. Goggin tendered a final police report and said the State would be ready for trial on any date. Maloney took possession of the discovery tendered to Tuite and told Bracy that he would give it to the lawyer who would represent him. Tom Peters filed an appearance on behalf of Hooper. By agreement, the matter was continued to May 22, 1981.

23. On May 22, 1981, Bracy indicated that he had been unable to obtain an attorney and asked Maloney to appoint a lawyer for him other than a public defender. The matter was continued to May 28, 1981.

24. On May 28, 1981, assistant state's attorney Gregg Owen stated that a State's

---

fendants convicted, because the judge was motivated to return a verdict that would not spark the suspicions of authorities. *People v.*

*Hawkins,* 181 Ill.2d 41, 228 Ill.Dec. 924, 690 N.E.2d 999 (1998).

witness had been contacted and threatened. Maloney told Bracy that a lawyer would meet with him the following day. The case was continued to May 29, 1981.

25. On May 29, 1981, attorney David Mejia appeared in court on behalf of Bracy. Mejia told Maloney that he and Bracy had a conference earlier that morning but they did not have a meeting of the minds. Maloney stated that there was no sense in appointing Mejia under those conditions and said that he would appoint another lawyer for Bracy. The subject of a trial date was raised. An attorney from Frazin's office said he would need three weeks. Goggin supplied a list of prosecution witnesses and said that the State would make a woman in protective custody available for interview. The case was continued to June 2, 1981.

26. On June 2, 1981, Robert McDonnell appeared in court and was appointed to represent Bracy. McDonnell stated that he had no conversations with Maloney before being appointed. He heard of his appointment by a call from Maloney's clerk. He stated that Maloney probably took his name off of a list after considering the nature of the case. On motion of the defendant, the case was continued to June 18, 1981.

27. On June 18, 1981, Maloney stated that the State was ready and asked if early August was acceptable. Goggin stated that he was looking at early July. McDonnell responded that he was ready. The case was set for July 13. On July 13, Frazin asked for a continuance and the case was continued to July 20.

28. On July 20, 1981, Maloney granted the motion of McDonnell and Frazin for a severance from Hooper and the trial began.

29. Shortly after McDonnell was admitted to practice, he was appointed an assistant state's attorney, serving in that capacity for four and one-half years. He entered private practice as a criminal defense lawyer in 1954 or early 1955. McDonnell tried approximately 40 murder cases before being appointed to represent Bracy.

30. In 1965, McDonnell was convicted of conspiring to transport stolen securities. He served two years in prison from 1968 until 1970. In 1980, the Illinois Supreme Court reinstated his law license. In 1989, McDonnell was convicted of attempting to pay off a labor union officer, who was also a trustee of a pension fund, in return for kickbacks. He was sentenced to six years in prison. *See United States v. Taglia*, 922 F.2d 413 (7th Cir.), *cert. denied*, 500 U.S. 927, 111 S.Ct. 2040, 114 L.Ed.2d 125 (1991). McDonnell withdrew his name from the roll of attorneys rather than be disbarred. McDonnell was an associate of, and an attorney for, organized crime figures.

31. There is no evidence that McDonnell was ever engaged in the practice of law with Maloney.

32. There is no evidence that McDonnell's appointment was conditioned upon any agreement or understandings with Maloney to accept a speedy trial. Aside from obvious character questions raised by McDonnell's two criminal convictions and disbarments, he was apparently sufficiently experienced and qualified to try a capital case. The prosecutor in the case stated that McDonnell's representation of Bracy was skillful and vigorous.

33. McDonnell testified that seven weeks is an adequate and not atypical period of time to prepare for a capital case trial. It does not appear that the case was rushed to trial or set for trial based on any other pending cases in which Maloney had taken or was taking bribes.

34. No question has been raised with respect to the appointment or conduct of Collins' attorney who was said to be well qualified. There is no basis to disregard the finding of the Illinois Supreme Court that "the record indicates that both attorneys were experienced criminal lawyers. They conducted vigorous cross-examination, raised countless objections, adequate-

ly presented the alibi defenses, and in all respects sought to protect the interests of their clients." *Collins I*, 87 Ill.Dec. 910, 478 N.E.2d at 283. *See also Collins II*, 180 Ill.Dec. 60, 606 N.E.2d at 1141–42.

35. McDonnell was disappointed with the fee Maloney approved for his services. His fee request was cut from $5,000 to $3,500.

### iii. Thomas Maloney

36. Thomas Maloney practiced criminal law for approximately 25 years before being appointed to the bench by the Illinois Supreme Court in 1977 with the backing of Chicago First Ward politicians Fred Roti and Pat Marcy.

37. In 1977, Maloney represented Harry Aleman who was charged with murder. Attorney Robert Cooley was approached by Pat Marcy to see if he could guarantee an acquittal. Cooley approached Judge Frank Wilson who agreed to fix the case for $10,000. Wilson had been removed from the case on motion of Maloney. It was arranged to have Maloney withdraw the motion and then withdraw from the case. In a bench trial before Wilson, Aleman was acquitted. *See People v. Aleman,* 281 Ill.App.3d 991, 217 Ill.Dec. 526, 667 N.E.2d 615 (1996), *appeal denied,* 168 Ill.2d 600, 219 Ill.Dec. 567, 671 N.E.2d 734 (1996), *cert. denied,* 519 U.S. 1128, 117 S.Ct. 986, 136 L.Ed.2d 868 (1997), *habeas corpus denied sub nom., United States ex rel. Aleman v. Circuit Court of Cook County,* 967 F.Supp. 1022 (N.D.Ill.1997), *aff'd sub nom., Aleman v. Honorable Judges of Circuit Court of Cook County,* 138 F.3d 302 (7th Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 162, 142 L.Ed.2d 132 (1998). Before he was appointed to the

bench, Maloney had the reputation of being a "fixer" among criminal circles.

38. Maloney began hearing criminal cases in 1979 and gained the reputation of being a tough, pro-prosecution judge. Michael Goggin, one of the prosecutors in the Bracy and Collins case, tried a few cases in front of Maloney. He testified, in a deposition, that Maloney's "impression or definition of legal precepts was similar or consistent with what mine were, and I was a prosecutor."

■ 39. The Government sentencing recommendation [5] in the *Maloney* case describes his conduct on the bench as follows:

> ... THOMAS MALONEY's corruption began at the time he was a criminal defense attorney paying off judges and court personnel to fix cases-including a notorious murder case-and continued through the time he was a judge working as a mafia factotum in the Cook County Circuit Court system and taking all manners of bribes on very serious criminal cases. Thomas Maloney's reputation as a strict prosecution-oriented judge was no mistake. By casting this image, Maloney sought to deflect suspicion from his criminal activity, while simultaneously giving select desperate defendants who knew the right people an incentive to pay him off. Thus, by using his position as a felony trial court judge to extract bribes from defendants who faced long periods of imprisonment or execution, THOMAS MALONEY far surpassed the category of corrupt jurist to chart a new territory of defilement.

\* \* \* \* \* \*

5. To the extent not inconsistent with the federal habeas corpus statute, the Federal Rules of Evidence apply to this proceeding. Fed. R.Evid. 1101(e). *See Silagy v. Peters,* 905 F.2d 986, 1009 (7th Cir.1990), *cert. denied,* 498 U.S. 1110, 111 S.Ct. 1024, 112 L.Ed.2d 1106 (1991). The Government's version of Maloney's offense, a statement of a public agency, contains factual findings, and resulted from an investigation pursuant to authori-

ty. Therefore, it is presumed to be trustworthy and the burden was on respondents to show that it lacks trustworthiness, which they did not show. Because all the requirements for admissibility under Fed.R.Evid. 803(8)(C) are satisfied, the Government statement is admissible evidence. *See* Fed.R.Evid. 803(8)(C); *Collins IV,* 49 F.Supp.2d at 604–05.

... when he got his turn on the bench, THOMAS MALONEY imposed a sinister system which had the dual effect of concealing and promoting his corruption. THOMAS MALONEY the former champion of the defendant became one of the most ruthless judges on the bench. Showing defendants little mercy had the effect of diverting any conceivable suspicion from MALONEY while at the same time giving defendants a strong motivation to cough up big bribery dollars.

40. There is circumstantial evidence, in the form of an FBI analysis of Maloney's expenditures, that he received substantially more income than his salary during the period from 1978 through 1984. His expenditures exceeded his known legitimate income by approximately $400,000. In the year 1981, the excess was $14,466.

41. Thomas Maloney took the witness stand before this court in this proceeding. Maloney denied generally any bias with respect to the petitioners or with respect to their trial. Although he did not testify in his own criminal trial, before this court he vehemently and arrogantly denied all of the bribery charges clearly established by the jury findings and the evidence presented at his criminal trial. In non-responsive, volunteered statements, Maloney attacked the witnesses who testified against him. He blamed his own conviction on misconduct of the prosecutor, a conspiracy, and the incompetence of his attorneys. Thomas Maloney's denials of bribetaking lack credibility. He was steeped in corruption. Whether or not he engaged in compensatory bias in this case to deflect attention from cases in which he took bribes cannot be resolved based on his testimony or denials. As the Court of Appeals has recognized, the presumption that "judicial officers perform their duties faithfully" has been solidly rebutted by the evidence of Maloney's crimes. *See Bracy I*, 81 F.3d at 688 (citing *Del Vecchio v. Illinois Department of Corrections*, 31 F.3d 1363, 1372–73 (7th Cir.1994), *cert. denied*, 514 U.S. 1037, 115 S.Ct. 1404, 131 L.Ed.2d 290 (1995)).

42. Maloney attached particular importance to the Collins and Bracy convictions and sentences, as well as Hooper's. During his allocution before being sentenced for racketeering, he spoke of the outcome of the cases as a credit to his record as a judge and evidence that he was not corrupt.

#### iv. Maloney's Other Cases

43. Maloney conducted bench trials in June, September, and November of 1981 in cases in which Herb Barsy represented the defendants. In each case, the defendant was found not guilty. There is not sufficient evidence, however, to conclude that the verdicts were the result of impropriety on the part of Maloney in those cases.

44. Maloney claims to have handled as many as 6,000 cases during his time on the criminal bench. Whether or not this is an exaggeration is not shown by the record here. Other than as stated, no study has been made of the number of acquittals he ordered. Petitioners provide a list and analysis of cases in which decisions by Judge Maloney were reversed on appeal. All the cases are reversals or remands in favor of the defendants. None of the cases are reversals or remands in favor of the State. Petitioners contend it can be inferred from this evidence that Maloney favored the prosecution. No such inference can be drawn from this particular evidence. The prosecution has limited appeal rights in criminal cases. Therefore, no conclusion can be drawn from comparing the number of defendant-favoring reversals to the number of prosecution-favoring reversals. No conclusion can be drawn from the number of cases in which Judge Maloney was reversed because no comparison is made between appeals in Maloney cases and appeals in cases presided over by other judges.

45. The evidence does not support that there is any connection between Maloney or his conduct in petitioners' case and organized crime ties to the Arizona murders for which Bracy has been convicted.

46. In *People v. Titone*, 151 Ill.2d 19, 175 Ill.Dec. 702, 600 N.E.2d 1160 (1992), a new trial was sought on the grounds that, in 1982, Maloney took a $10,000 bribe to acquit Titone, but nevertheless convicted the defendant to deflect suspicion. The judge hearing the postconviction petition vacated the death sentence, but denied a new trial. The Supreme Court of Illinois affirmed. Subsequently, however, the postconviction judge also vacated the convictions and granted a new trial. *See* Ian Ayres, *The Twin Faces of Judicial Corruption: Extortion & Bribery*, 74 Denv. U.L.Rev. 1231, 1252 (1997).

47. During the same time petitioners' case was pending, other cases were pending in which Maloney took bribes, particularly the close in time *Chow* and *Rosario* cases. Before and after this time, Maloney was engaged in a pattern of receiving money. Based on the evidence in the record, it is a possible and reasonable inference in this case that Thomas Maloney was motivated, at least in part, to maintain a prosecution-oriented attitude and to make pro-prosecution rulings by a desire to deflect suspicion from cases in which he accepted bribes. Other documented instances of Maloney so acting to deflect suspicion from his corrupt conduct are reported in the *Hawkins* and *Titone* cases, *supra*.

### III. CONCLUSIONS OF LAW

Chief Justice Rehnquist stated in *Bracy II* that "the floor established by the Due Process Clause clearly requires a 'fair trial in a fair tribunal,' *Withrow v. Larkin*, 421 U.S. 35, 46, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975), before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Bracy II*, 520 U.S. at 904–05, 117 S.Ct. 1793. In support of this holding, the court cited *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 821–22, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986), and *Tumey v. State of Ohio*, 273 U.S. 510, 523, 47 S.Ct. 437, 71 L.Ed. 749 (1927), cases in which disqualified judges were found to have had a "direct, personal and substantial" pecuniary interest in the outcome of cases before them.

*Bracy II* also states: "difficulties of proof aside, there is no question that, if it could be proved, such compensatory, camouflaging bias on Maloney's part in petitioner's own case would violate the Due Process Clause of the Fourteenth Amendment." *Bracy II*, 520 U.S. at 905, 117 S.Ct. 1793. It was emphasized that petitioner must "obtain evidence sufficient to support a finding of actual judicial bias in the trial of his case." *Bracy II*, 520 U.S. at 909, 117 S.Ct. 1793.

Discovery was warranted, the court said, because both collateral corruption was shown and because of specific allegations of bias in Bracy's own case, consisting of the corrupt appointment of trial counsel— "a former associate of Maloney's in a law practice that was familiar and comfortable with corruption, [who] may have agreed to take this capital case to trial quickly so that petitioner's conviction would deflect any suspicion the rigged *Rosario* and *Chow* cases might attract." *Bracy II*, 520 U.S. at 909, 117 S.Ct. 1793. However, as the findings stated above show, petitioner Bracy has not established that his attorney was an associate of Maloney's, or that there was any understanding that he would take Bracy's case to trial quickly, or that he would engage in any effort to deflect suspicion from any case rigged by Maloney.

Nor have petitioners established, by study of other cases decided by Maloney when he was a judge, a pattern that would warrant a finding that he was always biased against defendants in cases in which he was not bribed. And, as to this case, the Court of Appeals majority remarked it "may be a case in which any judge would have ruled in favor of the government in the instances of which the defendants complain." *Bracy I*, 81 F.3d at 691.

The findings and record before this court clearly substantiate the collateral corruption claims previously made to this court, the Court of Appeals, and the Supreme Court with respect to the bribes taken by Maloney in other cases, but do

not supply direct evidence of bias in this case. Yet, when the entire record of Maloney's corruption is considered, it is possible and reasonable to infer that because of his extensive corruption and past pro-prosecution rulings intended to deflect attention, part of his motivation to act in a way mostly favorable to the prosecution in this case in which he was not bribed was to deflect attention from the cases in which he was bribed.

The question then becomes: is an inference of an improper motivation enough to vacate either or both the jury's verdicts and the sentences imposed? Is this then a case like that described in *Del Vecchio*, 31 F.3d at 1380, showing "a possible temptation so severe that we might presume an actual, substantial incentive to be biased?" Judge Rovner, in her dissent in the Court of Appeals, seemed to say so, but Judge Posner, for the majority, apparently thought otherwise. *See also Cartalino*, 122 F.3d at 9–10. However, those opinions focused principally on the effects of collateral corruption.[6]

█ The Seventh Circuit has stated that showing that a judge took bribes in other cases is not, by itself, enough to support that a compensatory bias existed in a case in which no bribe was solicited, offered, or paid. *Bracy I*, 81 F.3d at 690; *Cartalino*, 122 F.3d at 10. *But see Bracy I*, 81 F.3d at 698 (Rovner, J., dissenting); *Cartalino*, 122 F.3d at 11 (Rovner, J., concurring in the judgment). Also, a judge's philosophical or political predisposition toward being prosecution-oriented[7] is not a basis for vacating any convictions if such predisposition is not motivated by pecuniary or other improper interests.[8] *Bracy I*, 81 F.3d at 688. *See also Del Vecchio*, 31 F.3d at

1372–73. The question in the present case is what evidence must be shown in order to cross the line from being "merely" evidence of bribetaking in other cases (collateral corruption) to being sufficient proof of actual bias in petitioners' trial motivated by Maloney's pecuniary or penal interests.

As is discussed in the findings, there is evidence of a number of cases in which Maloney received bribes. There is also evidence of income from unknown sources that raises suspicions as to Maloney receiving bribes in a number of additional cases as well, though no adequate proof is presented regarding specific additional cases. There is also evidence that, in at least some cases, Maloney was motivated to act in an attempt to cover up criminal wrongdoing. However, the evidence does not establish that an interest in covering up wrongdoing or motivating larger bribe payments pervaded every action taken by Maloney as a judge. Maloney's bribetaking has not been shown to have been so pervasive a part of his judicial practices that it can be assumed he was always, or even usually, motivated by his pecuniary and/or penal interests when exhibiting his prosecution-oriented tendencies. At most, it can be said he was often so motivated. But Maloney presided over a large number of cases. Therefore, the particular facts of petitioners' case must be examined to determine whether there is indication that, at their trial, Maloney was motivated by his pecuniary or penal interests in any aspect of the case.

█ The inference of a motivation to make pro-prosecution rulings in this case requires examination of the trial starting first with the jury's findings of guilt. The

---

6. For contrasting views of how this issue should be resolved, see: Ian Ayres, *The Twin Faces of Judicial Corruption: Extortion & Bribery*, 74 Denv. U.L.Rev. 1231 (1997), and Thomas M. DiBiagio, *Judicial Corruption, The Right to a Fair Trial, & the Application of Plain Error Review: Requiring Clear & Convincing Evidence of Actual Prejudice or Should We Settle For Justice in the Dark?*, 25 Am. J.Crim. L. 595 (1998).

7. Respondents do not dispute that Maloney was a "tough," prosecution-oriented judge.

8. The majority opinion in *Bracy I*, 81 F.3d at 688, refers to predispositions arising "from some connection pecuniary or otherwise." *Bracy II*, 520 U.S. at 905, 117 S.Ct. 1793, makes clear that a judge's penal interest is one of those other motivations for a predisposition that supports overturning a verdict presided over by the judge.

jury's findings are well supported by the evidence. There is no basis to doubt the guilt of the petitioners. In addition to federal review, this case has been before the Supreme Court of Illinois twice on the appeals of Bracy and Collins.[9] There is no basis to believe that the jury's findings are undermined by trial errors. Based on the trial record, there is no substantial reason to think that, in this case, the jury's findings were tainted by Maloney's collateral corruption or by any motivation to deflect attention from his corruption.

■ However, the impact of Maloney's most significant pro-prosecution discretionary rulings are of more concern because they do not admit to an entirely objective review or analysis. The most important discretionary rulings relate to the sentencing hearing and the sentences imposed—where there is also good reason to question Maloney's conduct.

■ A judge attempting to bolster his reputation as a harsh judge to whom it would be worth paying a bribe can certainly build on that reputation by presiding over a case in which the death penalty is imposed. Although Maloney's discretionary rulings during the sentencing phase were not subject to reversal given the deferential standards applicable, see *Bracy I*, 81 F.3d at 694–95; *Collins III*, 868 F.Supp. at 977, 986–89, 991, 992–93; *Collins I*, 87 Ill.Dec. 910, 478 N.E.2d at 285–88, a different issue is now before the court. Procedural habeas issues such as procedural default and waiver and whether the rulings prejudiced petitioners in the

*outcome* of their case[10] are not at issue. The question is whether Maloney's rulings during the sentencing phase support the existence of actual bias motivated by his pecuniary or penal interests.

As Judge Rovner noted, *Bracy I*, 81 F.3d at 701 n. 3, Maloney did not sever the Collins and Bracy sentencing hearings.[11] The consequence to Collins was that the striking evidence of Bracy's additional Arizona murders was before the jury considering Collins' fate at the same time it was considering Bracy's conduct. A severance, with the jury considering Collins' case first before hearing about the additional Bracy murders, would have been an obvious precaution with little additional expenditure of time required on the part of the jury. It also would have granted Bracy's attorney some additional time to prepare for the sentencing phase without leaving the jury with free days.

Maloney imposed the death sentences, 60–year terms for armed robbery, and 60–year terms for kidnapping (erroneously as to kidnapping, *Collins I*, 87 Ill.Dec. 910, 478 N.E.2d at 285–86). The jury determined the defendants' eligibility for the death sentences and then the absence of mitigating circumstances which required that death sentences be imposed, but it was within the power of the trial judge to review the accuracy of the jury's determinations. Moreover, the length of the armed robbery and kidnapping terms were within the discretion of the trial judge.

9. The Supreme Court of Illinois also considered the factual situation twice in appeals by Hooper. *See Hooper II*, 133 Ill.2d 469, 142 Ill.Dec. 93, 552 N.E.2d 684 (1989); *Hooper III*, 172 Ill.2d 64, 216 Ill.Dec. 633, 665 N.E.2d 1190 (1996).

10. If Maloney acted with actual bias during the sentencing phase of the case, the sentences must be vacated regardless of whether Maloney's bias affected the outcome of the sentencing phase; the actual bias claim is not subject to harmless error review. *Bracy I*, 81 F.3d at 688; *Cartalino*, 122 F.3d at 9–10; *Collins IV*, 49 F.Supp.2d at 600.

11. The reviewing courts denied relief on the continuance issue primarily because of waiver and the failure of petitioners to show they suffered any prejudice because they could not show that a continuance would have enabled them to present additional evidence that might have affected the outcome of the sentencing phase. *See Bracy I*, 81 F.3d at 695; *Collins I*, 87 Ill.Dec. 910, 478 N.E.2d at 286–87; *Collins III*, 868 F.Supp. at 987–89. As to severance, the issue was not raised in the state courts and was denied on waiver grounds in federal court. *See id.* at 991.

The trial record supports that Maloney exhibited a pro-prosecution bias during the sentencing phase. Because he acted in a particularly pro-prosecution manner, it can be inferred that his conduct during the sentencing phase was motivated, at least in part, by his compensatory bias, that is his pecuniary and penal interests. Furthermore, there is another piece of evidence that is particularly convincing support for finding that Maloney was motivated by his compensatory bias during the sentencing phase of this case. At Maloney's sentencing hearing on his federal charges during which he arrogantly proclaimed his innocence, he specifically cited to the death penalties imposed on Collins, Bracy, and Hooper as showing the true Maloney, that is that he was a careful, thorough, and tough judge whose closely scrutinized death penalty sentences were not reversed on appeal. The evidence supports that Maloney's pecuniary and penal interests (his compensatory bias) motivated him to be biased against petitioners during the penalty phase of their trial.

The discretionary rulings involving the sentencing hearings and sentencing are both the most sensitive and questionable in this case. On this record, these discretionary rulings should be vacated and a new sentencing hearing should be ordered. The petitioners are entitled to habeas corpus relief vacating their sentences and requiring the state to conduct new sentencing hearings within 90 days.

IT IS THEREFORE ORDERED that:

(1) Enter Findings of Fact and Conclusions of Law granting in part and denying in part petitioners' petitions for writs of habeas corpus.

(2) The Clerk of the Court is directed to enter judgment in favor of petitioners and against respondents granting in part and denying in part the petitions for writs of habeas corpus. The jury's findings of guilt are affirmed. The petitioners' sentences in Indictment No. 81–1204 in the Circuit Court of Cook County, Illinois are vacated without prejudice to respondents seeking, within 90 days, to retry and represent

evidence relating to the proper sentences to be imposed by a court on the charges on which the petitioners were convicted.